**UNITED STATES of America,**
**Appellee,**

v.

**Ronald WOODRUM, Defendant,**
**Appellant.**

No. 99–1697.

United States Court of Appeals,
First Circuit.

Heard Nov. 2, 1999.

Decided Jan. 20, 2000.

Rehearing and Suggestion for Rehearing
En Banc Denied April 6, 2000.*

* Editor's Note: The order denying rehearing
and suggestion for rehearing en banc and
Judge Lynch's dissent therefrom will be pub-

Jonathan Shapiro, with whom Noel
Richardson and Stern, Shapiro, Weissberg
& Garin were on brief, for appellant.

Patrick M. Hamilton, Assistant United
States Attorney, with whom Donald K.
Stern, United States Attorney, and John
A. Wortmann, Jr., Assistant United States
Attorney, were on brief, for the United
States.

Before SELYA, Circuit Judge,
COFFIN, Senior Circuit Judge, and
BOUDIN, Circuit Judge.

SELYA, Circuit Judge.

This appeal raises a novel constitutional
question. After traversing uncharted
Fourth Amendment waters, we affirm the
trial court's denial of a passenger's motion
to suppress evidence gleaned as a result of
a police stop, on bare suspicion, of a taxi-
cab enrolled in a voluntary Boston Police
Department (BPD) program designed to
ensure cabdriver safety.

## I. BACKGROUND

Understanding this case requires familiarity with both the BPD's Taxi Inspection Program for Safety (TIPS) and the events surrounding the traffic stop. We treat these topics separately.

### A. *The Program.*

In 1991, responding to safety concerns accentuated by two recent murders, Boston's police commissioner promulgated an executive order that instituted "Operation Taxi." In terms, the order "actively encouraged" police officers "to make frequent stops of taxicabs for the purpose of checking on the operator's safety," especially after dark and in high-crime areas. In the order's aftermath, however, a number of state trial judges ruled that stops made pursuant to Operation Taxi violated the constitutional proscription against unreasonable searches and seizures. *See* U.S. Const. amend. IV. Rather than throw out the baby with the bath water, the BPD reconfigured the program in an effort to meet the courts' objections.

The police commissioner launched the new program, nicknamed TIPS, on September 3, 1996. The promulgating order made taxi owners' participation voluntary and assigned responsibility for enrolling acquiescent owners to the BPD's Hackney Carriage Unit. Owners who opted to participate were given decals and told to affix one to each of the cab's rear side windows and a third in a conspicuous location in the rear passenger compartment. Each decal is four by five inches in size, with a bright red border, and bears the BPD shield. Each states in block print (in English and Spanish): "THIS VEHICLE MAY BE STOPPED AND VISUALLY INSPECTED BY THE BOSTON POLICE AT ANY TIME TO ENSURE DRIVER'S SAFETY." The words "PUBLIC NOTICE" appear in enlarged letters above this statement and the words "BOSTON POLICE TAXI INSPECTION PROGRAM FOR SAFETY" appear in enlarged letters below. TIPS differs from its predecessor program in these two respects: voluntary participation and deployment of identifying decals.

The police commissioner's order instructed uniformed and plainclothes personnel to make frequent stops of taxis that featured the decals to check on the operators' safety. The order continued:

> Stops should be conducted when and wherever necessary, particularly during the evening and early morning hours. Attention will be given to isolated and high crime areas. Taxi drivers are not to be detained longer than is necessary to check on the welfare of the operator. Passengers in occupied taxis are to be given a brief explanation of the purpose of the stop: **Operator Safety**. A Taxi Inspection Program for Safety form (BPD form 1833, revised 8/96) . . . shall be completed at the time of the stop.

### B. *The Stop and its Aftermath.*

TIPS was in effect shortly after midnight on January 22, 1998, when police sergeants Stephen Meade and Eric Bulman heard a report of a shooting near the intersection of Columbia Rd. and Washington St. in the Grove Hall section of Dorchester (a high-crime neighborhood). The officers, who were in plainclothes, drove toward that intersection in an unmarked car to offer assistance. As they neared their destination, they heard a second radio bulletin: two police officers, on foot, were pursuing an individual in the vicinity of Castlegate Rd. and Blue Hill Ave. Meade and Bulman drove there instead— the locus was only a few blocks away from the site of the reported shooting—and discovered that their fellow officers had cornered the object of their pursuit inside a building on Blue Hill Ave. The pursuing officers arrested the individual, informing Meade and Bulman that the arrest related to a drug transaction rather than to the recent shooting.

Meade and Bulman began walking toward their car at approximately 12:40 am

(a half-hour after they had heard the report of the shooting). As they stood on the sidewalk, they saw a cab pull up to the corner and stop before making a right turn from Castlegate Rd. The officers noticed a passenger—defendant-appellant Ronald Woodrum—on the far side of the rear seat. He glanced in their direction and then slouched down.

Thinking that the passenger might be the perpetrator of the earlier shooting, Meade and Bulman decided to follow the taxi. They trailed the vehicle for about a block, observing that the passenger sat up straight once it had turned the corner. The officers then decided to stop the cab. They have testified that, although they were aware of the TIPS decals, their primary concern was the shooting investigation.

The officers flashed their lights and the taxi pulled to the side of the road. As Meade and Bulman walked toward it, they could see the appellant's right shoulder go up and his left shoulder dip as he glanced down toward the left. Based on these movements, the officers suspected that the appellant was secreting a weapon inside his coat. They flanked the cab and shined flashlights into the back seat. Meade could see that the appellant's right hand was moving around inside his coat. Meade opened the rear door closest to where Woodrum was seated, and Bulman opened the opposite door.

The appellant immediately started to protest that all he had was a beer. When he reached into his left jacket pocket with his left hand, Bulman told him not to take anything out of his coat and to put his hands in plain view. Notwithstanding this admonition, the appellant kept his right hand under his coat; Meade, concerned for his safety, directed the appellant to step outside. He grudgingly complied. When he freed his right hand and exited the taxi, a gun fell out of his jacket. At that point, the officers arrested him. Bulman and Meade filled out a TIPS form and took the appellant to the station house for booking.

A search performed at that time turned up crack cocaine, a pipe, a pager, and some cash.

In due course, federal authorities charged the appellant with being a felon in possession of a firearm and ammunition, and with possessing cocaine base with intent to distribute. *See* 18 U.S.C. § 922(g)(1); 21 U.S.C. § 841(a)(1). The appellant moved to suppress the physical evidence gleaned as a result of the stop, as well as evidence of incriminating statements made during his detention. Following an evidentiary hearing, the district court upheld the stop on dual grounds: first, that the circumstances gave rise to reasonable suspicion of criminal activity, warranting the stop; and second, that TIPS legitimated it. *See United States v. Woodrum*, No. 98–10183–RGS, 1998 WL 849373, at *3 (D.Mass. Dec.1, 1998). The appellant then entered a conditional guilty plea to reduced charges, reserving the right to appeal the denial of his suppression motion. *See* Fed.R.Crim.P. 11(a)(2). The district court imposed sentence and this appeal followed.

## II. ANALYSIS

We begin our substantive discussion with a synopsis of certain Fourth Amendment principles and then proceed to discuss this case.

### A. *The Legal Landscape.*

█ It is doctrinal bedrock that a police stop of a moving vehicle constitutes a seizure of the vehicle's occupants and therefore comes within the purview of the Fourth Amendment. *See Whren v. United States*, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *United States v. Hensley*, 469 U.S. 221, 226, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). This principle applies equally to drivers and passengers. *See United States v. Sowers*, 136 F.3d 24, 27 (1st Cir.1998); *see also Whren*, 517 U.S. at 819, 116 S.Ct. 1769 (evaluating a passenger's challenge to a traffic stop along with

the driver's). Hence, each occupant of a car has a right to challenge the propriety of a traffic stop under the Fourth Amendment. Although courts occasionally use the term "standing" as a shorthand for this status, the real implication is that the individual's Fourth Amendment interests were affected by official actions. *See Rakas v. Illinois*, 439 U.S. 128, 138–39, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *United States v. Sanchez*, 943 F.2d 110, 113 n. 1 (1st Cir. 1991).

■ The primary interests that the Fourth Amendment protects in this type of situation include an interest in freedom of movement and a concomitant interest in being insulated from the fear and anxiety that frequently accompany a sudden, unexplained stop. These interests "are personal to all occupants of the vehicle." *United States v. Kimball*, 25 F.3d 1, 5 (1st Cir. 1994). Although *Kimball* dealt with a private automobile, its logic applies equally to taxicabs. A taxi fare—who by definition has contracted to pay for both the right to exclude others from the cab and the right to control its destination in certain respects—has a reasonable expectation that he will not gratuitously be seized while en route. *See Rios v. United States*, 364 U.S. 253, 261, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960); *see also Townes v. City of New York*, 176 F.3d 138, 144 (2d Cir.1999) (describing as "clearly established" a taxicab passenger's right to be free from unreasonable seizure).

■ Absent a warrant, the police can intrude on such an expectation only in a few carefully circumscribed kinds of situations. *See Minnesota v. Dickerson*, 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). One such situation arises "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In such circumstances, the officer may stop a taxicab briefly and make reasonable inquiries of

the suspect designed to confirm or dispel his suspicions. *See, e.g., Guam v. Ichiyasu*, 838 F.2d 353, 355–56 (9th Cir.1988); *see generally Dickerson*, 508 U.S. at 373, 113 S.Ct. 2130; *Terry*, 392 U.S. at 30, 88 S.Ct. 1868. A second exception to the warrant requirement comes into play where an individual voluntarily consents to an intrusion. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Warrantless searches and/or seizures also have been upheld if the public interest in safety overbalances the intrusion on the individual so that the intrusion is reasonable. *See, e.g., Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 455, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990)(involving a highway checkpoint stop); *United States v. Martinez–Fuerte*, 428 U.S. 543, 562, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (same). Additional exceptions to the warrant requirement include administrative inspections and inventory searches. *See, e.g., New York v. Burger*, 482 U.S. 691, 702–03, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987); *Colorado v. Bertine*, 479 U.S. 367, 371, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987).

### B. *The Merits.*

In this instance, the government argues that the officers' warrantless stop of the cab was justifiable under two of these exceptions—as a "Terry stop" based on reasonable suspicion or, alternatively, as a stop premised upon the taxi owner's consent. The district court found both arguments persuasive.

■ **1. *Reasonable Suspicion.*** To justify a stop under the reasonable-suspicion standard, the government must show "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. 1868. The officer making the stop "must be able to articulate something more than an inchoate and unparticularized suspicion or 'hunch'" linking an individual to criminal

activity. *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (citation and some internal quotation marks omitted). This means that some of the facts on which the officer relies must be particular, that is, specific to the individual. *See United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *Terry*, 392 U.S. at 21 n. 18, 88 S.Ct. 1868; *United States v. Proctor*, 148 F.3d 39, 42 (1st Cir.1998). Consequently, the proper focus for evaluating the sufficiency of evidence of reasonable suspicion centers upon the objective significance of the particular facts under all the circumstances. *See, e.g., Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (per curiam).

 It is important to recognize that the *Terry* standard has a practical, commonsense bent. Thus, a combination of independently innocent behaviors and circumstances, both general and specific, can create reasonable suspicion in certain cases. *See Sokolow*, 490 U.S. at 9, 109 S.Ct. 1581; *see also Terry*, 392 U.S. at 30, 88 S.Ct. 1868 (explaining that reasonable suspicion may exist when the totality of the discerned circumstances signals "unusual conduct which leads [the officer] reasonably to conclude in light of his experience that criminal activity may be afoot"). Deference is due to the experienced perceptions of the officers, *see Ornelas v. United States*, 517 U.S. 690, 699–700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), but not blind deference; these perceptions must be reasonable under an objective standard, *see Terry*, 392 U.S. at 21, 88 S.Ct. 1868.

In this case, most of the facts underpinning the officers' stated suspicion were not particular to the appellant. These included the recent report of a shooting, the crime-ridden neighborhood, and the hour. While such facts may put officers on their guard, they cannot alone justify a stop. *See Kimball*, 25 F.3d at 7. Were the law otherwise, any person who happened to wander into a high-crime area, late at night, in the immediate aftermath of a serious crime, could be detained.

 The only suspect-particular observation on which the district court relied was that Woodrum tried to hide from the officers (or so they thought). The Supreme Court has held that, in some contexts, an obvious attempt to hide or to evade the authorities can be a factor in the calculus of reasonable suspicion. *See, e.g., United States v. Brignoni–Ponce*, 422 U.S. 873, 885, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). Thus, slouching, crouching, or any other arguably evasive movement, when combined with other factors particular to the defendant or his vehicle, can add up to reasonable suspicion. *See, e.g., United States v. Sharpe*, 470 U.S. 675, 682 n. 3, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *United States v. Aldaco*, 168 F.3d 148, 152 (5th Cir.1999). But not every slouch, crouch, or other supposedly furtive movement justifies a stop. *See, e.g., Reid*, 448 U.S. at 441, 100 S.Ct. 2752; *United States v. Guillen–Cazares*, 989 F.2d 380, 384 (10th Cir.1993). The proper inquiry is case-specific and context-contingent, and the surrounding circumstances ordinarily will tell the tale.

Here, reasonable suspicion presents a question that can be argued persuasively either way. On the one hand, a slouching movement is inherently ambiguous and, for the reasons that follow, it is especially difficult to draw an inference of criminal activity from the appellant's recession into the far corner of the back seat. Meade and Bulman were in plainclothes and standing near an unmarked vehicle. Their testimony is unilluminating as to whether any police cruisers or other identifiable police vehicles were parked at the scene or whether any uniformed police officers were in sight. The significance of the fact that an ordinary observer might not have known that the people clustered on the street corner were police may well be magnified, rather than lessened, by the totality of the circumstances: the early hour, the dangerous neighborhood, and the preva-

lence of crime likely would make an innocent person fearful for his safety and, accordingly, desirous of anonymity.

Despite the seeming persuasiveness of this argument, there is another side to the story. The street-wise judgments of experienced police officers are entitled to weight, and it is at least arguable that, given the peculiar concatenation of circumstances, the appellant's act of slouching down in the back seat, after seeing the officers, set him apart as someone who reasonably might be suspected of criminal activity.

To complicate matters further, this area of the law is in some flux. A divided Supreme Court (5–to–4) recently held that an officer was justified in suspecting a man of criminal activity when the man was in a high-crime district and fled upon seeing the officer. *See Illinois v. Wardlow,* —— U.S. ——, 120 S.Ct. 673, 674, 145 L.Ed.2d 570 (2000). The majority emphasized that evasive behavior—even evasive behavior that at some level is ambiguous—is a "pertinent factor in determining reasonable suspicion." *Id.* 120 S.Ct. at 674. *Wardlow* requires courts to reevaluate the calculus of reasonable suspicion. Under the circumstances, we think that the district court's alternative holding—that the taxi driver had authority to consent to a TIPS stop, and that the consent legitimized this particular stop, *see Woodrum,* 1998 WL 849373, at *3—is less problematic. Accordingly, we elect to forgo resolution of the reasonable-suspicion inquiry.

2. *The TIPS Consent.* Of course, the district court's alternative holding also is controversial. The appellant attacks it on several fronts. He maintains, inter alia, that there was insufficient evidence to establish either the taxi owner's or the taxi driver's consent and that, in all events, the consent of another could not legitimate stopping him absent his consent. He also postulates that the TIPS compact impliedly conditions the driver's employment on the sacrifice of Fourth Amendment rights and does not sufficiently limit the discretion of the officers executing it (and is, for these reasons, unconstitutional). Finally, he charges that, even if a TIPS consent legitimizes some stops, its scope does not extend to this stop because it was motivated by reasons apart from driver safety. These arguments warrant close perscrutation. In the end, however, we find them unpersuasive.

■ This case involves an unusual situation. Most of the decided cases dealing with the consent exception to the warrant requirement analyze that exception in the context of a search as opposed to a seizure. *See, e.g., Illinois v. Rodriguez,* 497 U.S. 177, 181–82, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *United States v. Matlock,* 415 U.S. 164, 169–72, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Schneckloth,* 412 U.S. at 219, 93 S.Ct. 2041. One reason, of course, is that in cases in which a person merely pauses voluntarily to answer a gendarme's questions, the detention customarily is not viewed as a seizure at all. *See Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion); *United States v. Mendenhall,* 446 U.S. 544, 555, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.); *cf. INS v. Delgado,* 466 U.S. 210, 218, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) (holding that factory workers were not seized when INS agents questioned them with their employer's consent).

■ However, when an encounter takes some appreciable time or moves to a private space (say, an interrogation room or a dwelling), the justification for the detention becomes an issue because the individual may no longer understand his participation to be voluntary. *See, e.g., Mendenhall,* 446 U.S. at 557–58, 100 S.Ct. 1870; *Kimball,* 25 F.3d at 8; *United States v. Berry,* 670 F.2d 583, 598, 604 (5th Cir.1982) (en banc). This furnishes an apt analogy for our case. At least for the interval immediately after an officer bent on making a TIPS stop flashes his lights in a show of authority, neither the driver nor

the passenger knows why their journey is being interrupted or has much reason to think that stopping is optional. The suspense of those early moments necessarily impinges on Fourth Amendment interests. *See Sitz*, 496 U.S. at 452–53, 110 S.Ct. 2481; *Martinez–Fuerte*, 428 U.S. at 558, 96 S.Ct. 3074. Put another way, because the officer's initiative "communicate[s] to a reasonable person that he [is] not at liberty to ignore the police presence and go about his business," a seizure occurs. *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988); *accord Florida v. Bostick*, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). Therefore, Woodrum was seized in the course of the TIPS stop.

 The government concedes the fact of the seizure, but responds that the taxi owner's consent to TIPS authorized it. The government, of course, has the burden of proving the voluntariness of the consent on which it relies. *See Mendenhall*, 446 U.S. at 557, 100 S.Ct. 1870. But, as far as the evidence shows, the owner freely chose to register for the program of taxi safety stops, and the TIPS decals furnish tangible proof of this consent. Although the consent was anticipatory and unparticularized, it was direct.[1] No more is exigible to sustain the devoir of persuasion.

 We turn, then, to the significance of this consent vis-à-vis the driver. It is at least arguable that the owner of a vehicle may authorize the kind of "safety stop" envisioned by the TIPS program over the driver's objection. *Cf. United States v. Carter*, 569 F.2d 801, 803–04 (4th Cir.1977)

(per curiam) (holding that an employer had power to consent to a search of a company-owned vehicle even if the vehicle was used almost exclusively by one employee); *New Hampshire v. Collins*, 133 N.H. 609, 581 A.2d 69, 72–73 (1990) (similar). The rationale of these cases, and others like them, flows smoothly from the Court's admonition that "when the prosecution seeks to justify a warrantless search by proof of a voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Matlock*, 415 U.S. at 171, 94 S.Ct. 988. The *Matlock* rationale might well be transferable to, and ultimately justify, reliance on an employer's consent to a stop, without more.

Here, however, we do not need to go so far as to hold that the owner's property rights in the vehicle and his entitlement to supervise its use legitimize all incidental intrusions occasioned by his consent to the seizure of his property. The purpose of the owner's consent here was not to implicate the driver in wrongdoing, but, rather, to secure the driver's safety (and, concomitantly, to preserve the value of his investment). In other words, in consenting to TIPS, the owner acted on the employee's behalf as well as on his own.[2] This identity of interests permits us to conclude that the brief and incidental detention of the driver brought about by the consensual seizure of the owner's property was rea-

---

1. This directness distinguishes this case from cases in which courts are asked to imply the owner's consent indirectly from his voluntary undertaking to do something that he has been warned might lead to a search or seizure. *See, e.g., McGann v. Northeast Ill. Reg'l Commuter R.R. Corp.*, 8 F.3d 1174, 1179–83 (7th Cir.1993).

2. Indeed, the taxi owner's consent reasonably can be viewed as a fulfillment of his employ-ment-related duty to provide a safe workplace for his drivers. After all, the drivers' safety is a work-related interest of the employer, unlike an abstract interest in cooperating with police to abate crime in general, and employees can expect an employer to seek police assistance in protecting the former interest even if consent to a criminal investigation of their outside activities would be suspect. *See Collins*, 581 A.2d at 73.

sonable under the Fourth Amendment, *cf.* *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 316–17, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978) (confirming that an employer may consent to OSHA inspections of workplace premises), and our holding need not sweep more broadly.

If more were needed—and we doubt that it is—the driver of the cab that the appellant hailed should not merely have expected and appreciated the consent but should have known of it. Thus, we think it fair under the circumstances to regard the driver himself as having consented to the stop. The detention involved no search and, as we have said, driver safety was implicated. Moreover, decals festooned the vehicle, and the conspicuousness of the display put the driver squarely on notice that the owner had enrolled the cab in the TIPS program. In our view, these decals symbolized both the owner's and the driver's consent to future stops.

■ The appellant attempts to parry these thrusts by insisting that, regardless of notice, the owner's initiative effectively abrogated the driver's Fourth Amendment right to resist searches and seizures, and that this abrogation imposed an unconstitutional condition on the employment relationship. This contention cannot withstand scrutiny. In the first place, the record contains no evidence that consent was a condition of employment. Thus, we do not know whether a nonconsenting driver would have been discharged or, in the alternative, permitted to remove the TIPS decals. In the second place, the appellant's position rests on an unstable legal foundation. Although public employers ordinarily cannot condition employment on an employee's consent to a search, *see* *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the taxi involved in this incident was privately owned and the driver privately employed. There is no sign that the government directed or required the owner to make TIPS participation a condition of employment. Where, as here, the government gives the private sector a free choice, the *Pickering* doctrine is inapposite. *See* *Koveleskie v. SBC Capital Mkts.*, 167 F.3d 361, 368 (7th Cir.1999). In the absence of any showing that state action prompted the imposition of the alleged term of employment, the appellant's "unconstitutional condition" argument founders.

■ We next inquire whether the owner's and driver's consent may justify a TIPS stop even though no positive consent has been obtained from the passenger. The district court answered this query affirmatively on the ground that "[t]he operator of a taxi ... has the authority to consent to its search over the objection of his passenger." *Woodrum*, 1998 WL 849373, at *3. This reasoning overlooks that a mere passenger has a right to protest a traffic stop, *see Whren*, 517 U.S. at 809–10, 116 S.Ct. 1769; *Sowers*, 136 F.3d at 27, but no corresponding right to protest the search of someone else's vehicle, *see Rakas*, 439 U.S. at 148, 99 S.Ct. 421. Accordingly, we take a different ratiocinative route—but in the end, hold that the passenger may be briefly detained even in the absence of his consent.

■ At times, an individual can consent to an intrusion that affects another's constitutionally protected interests without overstepping the bounds of the Fourth Amendment. Thus, for example, when two persons share common authority over premises or effects, one party's consent legitimates a warrantless search even if the search is aimed at ferreting out evidence of the other party's malefactions. *See Matlock*, 415 U.S. at 171, 94 S.Ct. 988. The Court's elaboration of this "third-party consent" principle has particular pertinence for present purposes:

> Common authority is, of course, not to be implied from the mere property interest a third party has in the property, ... but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* at 171 n. 7, 94 S.Ct. 988.

Up to now, this principle has found expression only in the context of consents to the search of property—but there is no sound reason to restrict the principle rigidly to that milieu. As this case illustrates, the logic of third-party consent can be adapted to seizures in some circumstances.

Freedom of movement is one of the foremost interests impugned by a traffic stop, *see Kimball*, 25 F.3d at 5, and the occupants of a cab—driver and passenger alike—plainly allocate shared control over their intertwined freedom of movement. The passenger's implied contract *qua* fare gives him a degree of authority over the direction and destination of the vehicle. By like token, the driver's command of the taxi allows him to maintain control over the vehicle's speed and route of travel. Bearing this shared authority in mind, it does not seem like a stretch to say that the driver has the authority to consent to a stop in his own right, and that the passenger, by entering the cab, assumes the risk that the driver may exercise his right to stop briefly along the way (say, to converse with a police officer).[3]

■ To be sure, this does not mean that a taxicab passenger assumes the risk of every type of seizure. The actions taken pursuant to the consent must be reasonable—and the Supreme Court has made it clear that "[t]he reasonableness of seizures that are less intrusive than a traditional arrest depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Brown v. Texas*, 443 U.S. 47, 50, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (citations and internal quotation marks omitted). Viewed in this light, determining the constitutionality of any given seizure requires a court to weigh factors such as "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty." *Id.* at 51, 99 S.Ct. 2637; *accord Sitz*, 496 U.S. at 450–54, 110 S.Ct. 2481; *Lopez Lopez v. Aran*, 844 F.2d 898, 905 (1st Cir.1988). All seizures must be reasonable. *See* U.S. Const. amend. IV. Seizures by consent generally are considered reasonable, *see Florida v. Jimeno*, 500 U.S. 248, 250–51, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991), because the consent acknowledges the individual's right to be free from interference and vitiates the intrusiveness of the action. Withal, the reasonableness of a seizure by third-party consent is less direct and must be analyzed by balancing the public interest against the individual's rights, as affected by another's consent to an intrusion.

■ In this instance, we conclude that the nature of TIPS makes the operator's consent a reasonable justification for stopping a taxicab (even though the stop involves, as we have said, a seizure of both the driver and the passenger). After all, TIPS came into being as a considered response to grave safety concerns; many taxi drivers had been robbed and two had been murdered. Given the obvious public interest in preventing such incidents, this history weighs heavily in constructing the requisite balance.

Moreover, the consent does not leave stops to the officers' unfettered discretion. The order issued to police personnel specifies that TIPS stops are to be conducted only "when ... necessary" to check on the taxi operator's safety. The record contains unrebutted testimony that this language accurately characterizes the actual

---

**3.** This mutuality of control of the vehicle's movement distinguishes this situation from cases such as *Stoner v. California*, 376 U.S. 483, 489, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964), and *Chapman v. United States*, 365 U.S. 610, 612–13, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961). In those cases, owners of real estate retained access to rented premises for particular purposes, but the lessees had ultimate control over the use to which the rented space was put (and presumably the power to exclude the owner, at least for most purposes). *See Matlock*, 415 U.S. at 171 n. 7, 94 S.Ct. 988 (distinguishing these two cases). In contrast, Woodrum had no right to divest the driver of control over the cab, and the stop intruded on both parties' rights in the same way and to the same degree.

implementation of the program.[4] Since police officers are constrained by that directive, we must regard a taxi owner's consent to TIPS stops as narrow in scope and purpose. *See id.* at 251, 111 S.Ct. 1801 ("The scope of a search is generally defined by its expressed object."); *Walter v. United States,* 447 U.S. 649, 656, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980) (plurality opinion) (similar); *see also United States v. Turner,* 169 F.3d 84, 87 (1st Cir.1999) (explaining that a consensual search may not exceed the scope of the consent).

On the other pan of the scale, we weigh the rather modest intrusion on passengers' liberty that TIPS entails. According to the officers' uncontradicted testimony, TIPS stops are usually brief and involve only limited inquiries to the driver and a quick visual inspection of the cab's interior. Objectively viewed, the intrusion is slight. *See Martinez–Fuerte,* 428 U.S. at 558, 96 S.Ct. 3074; *cf. Rios,* 364 U.S. at 262, 80 S.Ct. 1431 (suggesting in dictum that a momentary routine interrogation of the occupants of a standing taxi would not offend the Fourth Amendment).

We find more nettlesome the subjective aspects of the intrusion, as a reasonable passenger might well experience fear or anxiety in the interval between a stop and an officer's explanation. *See Delaware v. Prouse,* 440 U.S. 648, 657, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). Even so, under the TIPS regime this interval is usually quite brief, and the possibility of emotional distress is lessened somewhat by the existence of the decals and publicity about the program—avenues through which a reasonable passenger might be aware that the police were stopping taxis to check the drivers' well-being. *Cf. Martinez–Fuerte,* 428 U.S. at 558, 96 S.Ct. 3074 (suggesting that subjective intrusions are of less concern when passengers know that a stop is a matter of routine). Furthermore, to the extent that a passenger assumed the risk

that the driver would consent to the intrusion, *see supra* at 10–11, the intrusion is not an impediment to reasonableness. *See Matlock,* 415 U.S. at 171 & n. 7, 94 S.Ct. 988.

Assaying all of these competing considerations, we conclude that a seizure which occurs in the form of a voluntary, properly conducted TIPS stop passes the Supreme Court's balancing test. Consequently, we find the application of the third-party consent principle compelling and we hold that a police officer's stop of a taxicab displaying TIPS decals for purposes of checking on the driver's safety is reasonably justified by the owner's consent, notwithstanding the presence of a passenger in the cab who has not given any express consent.

■■■ The question remains whether this particular stop was justified by the taxi owner's consent. In this connection, the appellant's major premise is that the stop was not within the ambit of the consent because its impetus lay in the officers' desire to investigate a recent shooting rather than their desire to assure the driver's safety. The appellant's minor premise is that the officers effectively vitiated the consent by their failure after the initial stop to follow TIPS protocol.

We begin our analysis of these matters by reviewing what transpired below. The district court ruled that the officers' subjective motivations did not matter; the stop was constitutional, the court reasoned, as long as the officers could have stopped the taxi constitutionally. *See Woodrum,* 1998 WL 849373, at *3. For this proposition, the court cited *Whren,* 517 U.S. at 814–15, 116 S.Ct. 1769, in which the Supreme Court held that officers who had probable cause to believe that a driver had committed a minor traffic violation could constitutionally stop the vehicle even though their actual motivation to do so

---

4. Because we construe the program in the light most favorable to constitutionality, *see Almeida–Sanchez v. United States,* 413 U.S. 266, 272, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), we presume that the order did not allow completely random stops.

grew out of a suspicion that the occupants possessed drugs.

We cannot accept the district court's approach. Unlike in *Whren*, the purpose of the stop matters here. Because the authority provided by the consent was limited, the officers' reasons for effecting the stop are relevant to whether the consent legitimated it. A consent to TIPS probably would not justify, for example, a stop aimed at questioning a docile eyewitness to a recent crime or one aimed at collaring an illegal alien not thought to be dangerous.

■ Despite our disagreement with the lower court, we hold that the stop was within the purview of the consent. The scope of a consent is determined by what a reasonable person would think it to be. *See Jimeno*, 500 U.S. at 251, 111 S.Ct. 1801. On that basis, the cab owner's consent to stops that are necessary to ensure the driver's safety plainly would include stopping a taxi when a violent crime has occurred close by and the police have concluded (rightly or wrongly) that the passenger might be the culprit—a circumstance which most assuredly would place the driver in potential peril. To require a full-fledged, objectively reasonable suspicion would effectively nullify the TIPS program, a result that a reasonable person evaluating the scope of consent to the program surely would resist. Because a TIPS consent authorizes stops when police officers suspect that a cab driver is in harm's way, Meade's and Bulman's bare suspicion that a violent criminal was in the taxi justified this stop.[5] *Cf. United States v. Lopez–Pages*, 767 F.2d 776, 778 (11th Cir.1985) (stating that mere suspicion is enough to support a search once a passenger voluntarily has presented himself at an airport security area, and that reasonable suspicion is not necessary).

■ We need not linger over the appellant's minor premise. We already have determined that the initial stop did not in any way offend the Fourth Amendment. From that point forward, the officers' actions were fully justified by reasonable suspicion. Thus, any deviations from the TIPS protocol that may have transpired after the initial stop were of no moment. We explain briefly.

As the officers approached the taxi, they saw the appellant lean down toward his left side and they reasonably suspected that he was concealing a weapon inside his jacket. Then, when they peered into the back seat, they saw the appellant's right hand moving around underneath his jacket. This is exactly the kind of situation in which an officer's experience deserves deference. *See, e.g., United States v. Mitchell*, 951 F.2d 1291, 1296 (D.C.Cir.1991); *see also United States v. Beatty*, 170 F.3d 811, 814 (8th Cir.1999); *United States v. Young*, 105 F.3d 1, 7 (1st Cir.1997). This reasonable suspicion that the appellant was concealing a weapon justified the officers in blocking his exit, asking him to show his hands, and ordering him to step out of the taxi. *See Terry*, 392 U.S. at 24, 88 S.Ct. 1868 ("When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."); *cf. Pennsylvania v. Mimms*, 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (holding that officers may ask the occupant of a vehicle to step outside during a traffic stop even when no reasonable suspicion of criminal activity exists).

That ends the matter. Once the appellant exited the vehicle, the weapon tum-

---

**5.** To be sure, one officer testified that he would have made the stop even if the taxi did not have TIPS emblemata—a course of action that would have had no discernible legal justi- fication. But that testimony does not affect the outcome of this appeal. We concern ourselves with what was, not with what might have been. *See Proctor*, 148 F.3d at 42.

**14**

bled into plain view, and the officers had every right to act on what they saw.

### III. CONCLUSION

We need go no further. The taxi owner's consent to TIPS authorized the police to stop the taxi in which the appellant was riding on the mere suspicion that a dangerous felon might be inside. The officers' actions after the stop were legitimated by reasonable suspicion that the appellant was carrying a weapon and by caution for their own safety. Neither the stop nor the officers' subsequent actions offended the Constitution. Hence, we uphold the district court's denial of the motion to suppress evidence gleaned therefrom.

*Affirmed.*