**UNITED STATES of America**

v.

**Corey PARDUE, Defendant**

**No. CR. 03–06–P–C.**

United States District Court, D. Maine.

July 2, 2003.

---

Darcie N. Mcelwee, U.S. Attorneys Office, Portland, ME, for USA, Plaintiff.

Robert C. Andrews, Portland, ME, for Corey Pardue (1), Defendants.

## MEMORANDUM OF DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

GENE CARTER, Senior District Judge.

Defendant Corey Pardue, charged with knowingly possessing in and affecting commerce 20 rounds of Federal, Gold Medal Match, 308 (Winchester) caliber, Centerfire rifle ammunition, in violation of 18 U.S.C. § 922(g)(9), seeks to suppress the ammunition found in his backpack. Motion to Suppress (Docket Item No. 14). The Government objects. Government's Objection to Defendant's Motion to Suppress (Docket Item No. 16). The Court held a hearing and, based on the evidence presented at that hearing, the Court makes the following findings of fact.

### I. FACTS

At approximately 9:00 p.m. on March 30, 2002, the Portland Police Department received a 911 call complaining of a domestic disturbance at 27 Veranda Street. Complainant Kyra Pardue reported that her brother, Corey Pardue, who was present in the apartment and screaming in the background, had just thrown a lighter at her. While Kyra Pardue was on the phone with the dispatcher, she reported that Corey Pardue left the house on foot. The Portland Police dispatcher relayed this information over the radio to the police officers assigned to the area of Veranda Street.

While Portland Police Officers Richard Vogel and Christopher Coyne were en route to the Veranda Street home, the dispatcher gave the name and description of the suspect as Corey Pardue, a white male, 21 years old, wearing a hooded sweatshirt and a hat, and carrying a backpack. The dispatcher also indicated that Mr. Pardue was headed toward Washington Avenue.

Shortly after hearing the name and description of the suspect, Officer Coyne saw someone who matched the description given by the dispatcher, walking down Pembroke Street, near Veranda Street. Officer Coyne noticed Mr. Pardue's backpack, pulled his police cruiser over, and stopped to investigate the domestic complaint. When asked by Officer Coyne to identify himself, Defendant stated that he was "Corey Pardue" and indicated he had been in an argument with his sister. Officer Coyne then took Defendant's backpack from his shoulder and placed on the trunk of the police cruiser. Officer Coyne then patted Defendant down. After the patdown, Officer Coyne had Defendant sit in the back of the police vehicle, with the door open. At this point the backpack remained on the trunk of the vehicle. Officer Coyne then searched the backpack where he found Marine Corps discharge paperwork, a hunting rifle scope and mounting brackets, a "Gerber" multi-tool, personal hygiene products, and a couple of boxes of ammunition.[1] All of the items were left in the backpack and the backpack was again placed on the trunk of the police vehicle.

Shortly after Officer Coyne stopped Defendant, Officer Vogel arrived at the Veranda Street apartment to speak with Kyra Pardue. Kyra Pardue reported to Officer Vogel that her brother had thrown her son into a pile of laundry and then she asked him to leave. She also told Officer Vogel that her brother threw a lighter at her, striking her on the leg and causing a small welt. She explained that she then called the police, which caused her brother to threaten her. Thereafter, she told Officer Vogel, Corey Pardue left the apartment with his belongings.

After searching Cory Pardue and the backpack, Officer Coyne spoke to Officer Vogel over the radio, and he asked Officer Coyne to bring Mr. Pardue to the parking lot of 27 Veranda Street, which was only "a couple hundred feet" away. Tr. at 14. Officer Coyne placed the backpack in the front seat of the police cruiser and, with Defendant in the back seat, drove over to the parking lot. Once he arrived, Officer Coyne spoke with Officer Vogel who explained that Kyra Pardue reported that Corey Pardue hit her with a lighter and threw her son onto a pile of laundry. Officer Coyne then arrested Defendant and took him to the Cumberland County Jail.

When Officer Coyne arrived at the Cumberland County Jail, he took the Defendant and his backpack inside for booking. Once inside, the backpack was opened pursuant to standard practice of the Cumberland County Jail not to accept into the jail any personal items that are not on the person of the arrestee without an initial security search to determine if any of the property is, or contains, contraband. Ammunition is considered contraband at the Cumberland County Jail and, as such, it is not permitted inside the jail nor is it permitted to be retained at the jail until the owner is released. Since Officer Coyne was responsible for the backpack, he then took the backpack and all of its contents to the Portland Police Department and logged it in as property. In accordance

---

1. Officer Coyne remembered that the boxes of ammunition were transparent and that he was able to see the bullets inside without opening the boxes.

with the practice and procedure of the Portland Police Department, Officer Coyne logged the contents of the backpack on a property sheet, attached it to the backpack, and placed the backpack in an evidence locker.

## II. DISCUSSION

Defendant contends that the search of his backpack was unlawful because there was no reasonable suspicion that he was armed and that he was arrested without probable cause. The Government responds that Officer Coyne had probable cause to arrest Defendant for assault and, therefore, Officer Coyne was entitled to search the backpack incident to the arrest. In the alternative, the Government contends that Officer Coyne was justified in conducting an investigatory detention of Defendant and subsequently searching his backpack for reasons of officer safety. Finally, the Government relies on the doctrine of inevitable discovery to sustain the search of Defendant's backpack.

### A. The *Terry* Stop

■ Searches and seizures conducted without a warrant are *per se* unreasonable under the Fourth Amendment, subject to some exceptions. *Minnesota v. Dickerson,* 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); *United States v. Woodrum,* 202 F.3d 1, 6 (1st Cir.2000). One such exception was recognized in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which held that a police officer with reasonable suspicion of criminal activity may detain a suspect briefly for questioning aimed at confirming or dispelling his suspicions. *See Dickerson,* 508 U.S. at 372–73, 113 S.Ct. 2130; *Woodrum,* 202 F.3d at 6. The officer mak-

ing the stop must possess "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. 1868; *Woodrum,* 202 F.3d at 6. The government bears the burden of establishing by a preponderance of the evidence that a warrantless search falls within one of the exceptions. *McDonald v. United States,* 335 U.S. 451, 456, 69 S.Ct. 191, 93 L.Ed. 153 (1948). When the government fails to persuade the court that an exception applies, the evidence seized or otherwise obtained through the search must be suppressed.

■ A brief investigative detention does not violate a suspect's rights if the officer had reasonable suspicion to detain the suspect. In evaluating the reasonableness of a *Terry* stop, courts must consider the totality of the circumstances. *See United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). The officer's suspicion of criminal activity is reasonable if there are sufficient facts to support a reasonable belief in the possibility that criminal conduct has occurred or is about to occur. Here, the officers were responding to a domestic disturbance call, which, by its nature, implies the possibility of violence. In addition, there was reasonable suspicion to believe that an assault may have been committed based on the dispatcher's report that an object, in this case a lighter, had been thrown at the complainant. Officer Coyne was aware that the suspect had thrown a lighter at the complainant, and he was thus investigating a possible assault. These facts gave Officer Coyne reasonable suspicion that Defendant had engaged in criminal activity.[2] Accordingly, the investigative

---

2. The Government also asserts that at the time he identified Corey Pardue, Officer Coyne had probable cause to arrest him for assault and, thus, the search of Defendant's

backpack was lawful. The Court disagrees. Officer Coyne did not have probable cause to arrest Defendant until he went to the Veranda Street parking lot and discovered that the

**66**

detention of Defendant was based on reasonable suspicion that a crime had been committed.

## B. The Pat–Down and Search for Weapons

 In addition to the stop for questioning, the *Terry* Court held that "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a limited search of the person "to determine whether the person is in fact carrying a weapon." *Terry*, 392 U.S. at 24, 88 S.Ct. at 1881; *Dickerson*, 508 U.S. at 373, 113 S.Ct. 2130. Such a protective search, designed to allow the officer to conduct his investigation without fear of violence, must be "strictly 'limited to that which is necessary for the discovery of weapons.'" *Dickerson*, 508 U.S. at 373, 113 S.Ct. 2130 (quoting *Terry*, 392 U.S. at 26, 88 S.Ct. 1868); *see also Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Typically, this will be "a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault." *Sibron v. New York*, 392 U.S. 40, 65, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). If the frisk goes beyond what is necessary to determine if the suspect is armed, its fruits will be suppressed. *Dickerson*, 508 U.S. at 373, 378–79, 113 S.Ct. 2130; *see also United States v. Schiavo*, 29 F.3d 6, 9 (1st Cir.1994) (affirming suppression where officer's continued exploration of a bulging paper bag in suspect's pocket " 'after having concluded that it contained no weapon was unrelated to the sole justification of the search under *Terry*'") (quoting *Dickerson*, 508 U.S. at 378, 113 S.Ct. 2130). The Court cautioned that "[n]othing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or, indeed, any search whatever for anything but weapons." *Ybarra v. Illinois*, 444 U.S. 85, 93–94, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979).

 While the Government's legitimate concern for officer safety can, under proper circumstances, justify various protective measures during a *Terry* stop, there is no evidence in this case suggesting that Officer Coyne was motivated by safety concerns, nor is there sufficient evidence that would objectively give rise to a particularized safety concern to justify the search of Defendant's backpack. Indeed Officer Coyne's testimony at the hearing indicated that Defendant readily identified himself, and cooperated with Officer Coyne by answering his questions and following his directions. Officer Coyne explained that the reason he performed a pat-down search was that he believed that Defendant had "just [been] involved in a domestic violence situation with a domestic assault." Tr. at 24. Although the dispatcher's domestic disturbance report detailing that Defendant had thrown a lighter at his sister indicates that Defendant had recently been violent, there was no evidence presented that he appeared dangerous to Officer Coyne. In addition, there was no testimony from Officer Coyne that he believed Defendant to be armed. Officer Coyne explained that he searched the backpack as part of his routine practice "[t]o make sure there is not a weapon in there that can be used against me or anyone else." Tr. at 52. The Court concludes that Officer Coyne did not have the objectively reasonable belief that the Defendant was armed and dangerous that is necessary to lawfully pat down, let alone open and search, Defendant's backpack.

lighter Defendant threw at his sister actually hit her.

### C. Inevitable Discovery

 Even though the frisk for weapons exceeded the bounds of a lawful *Terry* stop, suppression is inappropriate in this case since the contraband in the backpack would have been inevitably discovered. The inevitable discovery doctrine is an exception to the exclusionary rule and is applicable whenever "the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching." *Nix v. Williams,* 467 U.S. 431, 447–48, 104 S.Ct. 2501, 2511, 81 L.Ed.2d 377 (1984). In this regard, the government bears the burden of demonstrating by a preponderance of the evidence that the evidence that was obtained by unlawful means would have been inevitably secured in some other lawful way. *Id.* at 444–45, n. 5, 104 S.Ct. at 2509, n. 5. The test the First Circuit has established for this Court to determine whether the inevitable discovery rule operates to bar suppression of the evidence is:

> (i) the lawful means of its discovery are independent and would have necessarily been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment.

*United States v. Zapata,* 18 F.3d 971, 978 (1st Cir.1994) (citing *United States v. Silvestri,* 787 F.2d 736, 744 (1st Cir.1986)).

 In this case, the record clearly establishes that this test is satisfied. When Officer Coyne brought Defendant up to the parking lot of 27 Veranda Street and spoke with Officer Vogel, he learned that Defendant had hit Kyra Pardue on the leg with a lighter and that Defendant had previously thrown Kyra Pardue's son onto a pile of laundry. At that time, he had probable cause to arrest Defendant for the assault on Kyra Pardue. As a result of Defendant's lawful arrest, the ammunition would have inevitably been discovered during the security search at the Cumberland County Jail or when Officer Coyne inventoried the contents of the backpack in order to store the backpack in the Portland Police Department's property locker. *See Colorado v. Bertine,* 479 U.S. 367, 369, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987) (exception to the warrant requirement for an inventory search); *United States v. Hawkins,* 279 F.3d 83, 85 (1st Cir.2002). Based on the evidence presented at the suppression hearing, the Court concludes that the ammunition would have inevitably been discovered by the inventory searches independent of Officer Coyne's unlawful search because those searches were necessary based on the practices of the Cumberland County Jail as well as of the Portland Police Department. Finally, the Court finds that the application of the inevitable discovery exception in this case does not provide an incentive for police misconduct or undermine the protections of the Fourth Amendment.

Accordingly, the Court **ORDERS** that Defendant's Motion to Suppress be, and it is hereby, **DENIED**.