**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-3314
_____

UNITED STATES OF AMERICA


v.

HENRY J. ALVIN, JR.,
                    Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.N.J. Crim. No. 2-14-cr-00405-001)
District Judge: Hon. Susan D. Wigenton
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
April 25, 2017
_____

Before: SMITH, *Chief Judge*, McKEE and RENDELL, *Circuit Judges*.

(Opinion filed:  July 19, 2017)

_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

McKEE, *Circuit Judge*.

Henry J. Alvin appeals the District Court's denial of his Motion to Suppress and the sentence that was imposed following his conviction. For the reasons that follow, we will reverse the denial of the Motion to Suppress and remand for further proceedings.[2]

**I**

During the District Court's suppression hearing, the Government introduced testimony that after Alvin recognized cars approaching him as unmarked police cars, he seemed "startled," and that he then got out of his car and crouched down in front of it, as if hiding.[3,4] Alvin eventually got up and walked back to his car, Officers Carvalho and Johnson approached him and identified themselves as police officers. In a letter to the District Court opposing Alvin's Motion to Suppress, the Government argued that the police had reasonable suspicion to stop Alvin because the "'whole picture' led to a reasonable, articulable suspicion that criminal activity was afoot."[5] More specifically, the Government stressed that: the area had a great deal of crime, it was late, Alvin appeared "startled" in response to a car he identified as the police, and Alvin hid in front of his car.

---

[2] Accordingly, we need not reach Alvin's challenge to the sentence imposed.
[3] Alvin's hearing testimony differed dramatically from the testimony of the police officers. The District Court credited the Government's testimony. In reaching our result, we rely only on the Government's testimony.
[4] J.A., 70–82.
[5] J.A. 144.

The Government reiterates its argument on appeal that the officers had reasonable suspicion for an investigatory stop under *Terry v. Ohio*.[6] After the officers identified themselves as police, they instructed Alvin to place his hands on the back of his car, which he did. While thus detained, Officer Carvalho walked to the front of Alvin's car. Carvalho testified that Alvin said something to the effect of "that's my vehicle, stay away from it," and Carvalho found that unusual.[7] Carvalho testified that he unsuccessfully searched for contraband or weapons outside the front of the car. He then looked inside and saw a handgun inside the cup holder on the center console next to the driver's seat. Alvin was then placed in handcuffs, and the gun was retrieved.

After the suppression hearing, the District Court concluded that the officers' testimony "support[ed] that there was a reasonable suspicion to stop the defendant and certainly probable cause to effectuate an arrest based on all of the circumstances that were surrounding the exchange that evening."[8] Without identifying or explaining any such "circumstances," the District Court denied Alvin's Motion to Suppress. Thereafter, Alvin agreed to a stipulated trial, reserving the right to appeal the suppression order, and was convicted of illegal possession of the seized firearm.

**II.**

---

[6] 392 U.S. 1 (1968).
[7] J.A. 80.
[8] J.A. 10.

We review the District Court's factual findings for clear error but our review of the court's legal conclusions is plenary.[9]

Law enforcement officers can, without a warrant, "conduct a brief, investigatory stop"—commonly dubbed a "*Terry* stop"—"when the officer has a reasonable, articulable suspicion that criminal activity is afoot."[10] In reviewing a challenge to a *Terry* stop, we ask, "[W]ould the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate?"[11] We have alternatively framed the question as "whether a reasonable, trained officer standing in [the arresting officer's] shoes could articulate *specific* reasons justifying [the present] detention."[12]

Here, the District Court failed to articulate why it found that the officers' testimony supported a reasonable articulable suspicion justifying a *Terry* stop. On appeal, the Government recounts the testimony it offered at the suppression hearing. It argues the apartment complex where Alvin was parked was in an area where "numerous . . . arrests" had occurred and that it was "late at night."[13] The "most important[]" factor supporting a finding of reasonable suspicion, according to the Government, was that

[9] *United States v. Lowe*, 791 F.3d 424, 427 (3d Cir. 2015). We have jurisdiction pursuant to 28 U.S.C. § 1291.

[10] *United States v. Brown*, 765 F.3d 278, 289 (3d Cir. 2014) (internal quotation marks omitted) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

[11] *Terry v. Ohio*, 392 U.S. 1, 22–23 (1968) (internal quotation marks omitted).

[12] *United States v. Brown*, 448 F.3d 239, 246 (3d Cir. 2006) (emphasis added) (internal quotation marks omitted) (quoting *Johnson v. Campbell*, 332 F.3d 199, 206 (3d Cir. 2006)).

[13] Appellee's Br., at 23.

Alvin "appeared startled and exited [i.e., "left"] his car and crouched down" when he recognized the unmarked car as a police car.[14]

That, without more, does not support a reasonable suspicion finding that is a condition of the limited investigatory stop *Terry* allows. First, to support the relevance of the late-night hour in a "high-crime" area, the Government cites *United States v. Goodrich*.[15] While that case does support the Government's claim that an area's crime rate and the time of day are relevant factors when deciding whether reasonable suspicion has been established,[16] we also stressed in *Goodrich* that "[a]n individual's presence in an area of expected criminal activity . . . is not enough to support a reasonable, particularized suspicion that the person is committing a crime."[17]

In fact, the officers in *Goodrich* were not even on routine patrol, as here. The officers there encountered the defendant while acting on a tip from a known informant whose reliability was not contested.[18] Ultimately, it was not just the high-crime area or the hour, but also the relationship between what the officers observed and the informant's knowledge—i.e., the temporal and geographical proximity—as well as the number of persons in the area that "place[d] th[at] case squarely on the constitutional side of the

---

[14] Appellee's Br., at 24.

[15] 450 F.3d 552 (3d Cir. 2006).

[16] *Id.* at 561–62.

[17] *Id.* at 561 (quoting *Wardlow*, 528 U.S. at 124).

[18] *Id.* More specifically, the police were on alert in *Goodrich* because 10 to 15 robberies of anhydrous ammonia from certain storage tanks had been reported before the police received the reliable tip that someone was in the process of stealing anhydrous ammonia from the tanks. *Id.*

divide [between reasonable and unreasonable suspicion]."[19]  Ironically, the circumstances that supported a reasonable suspicion finding in *Goodrich* are so much more precise and formidable than the circumstances here that Alvin, himself, might easily have relied upon that case to distinguish the actions of the police who stopped him.

The Government's reliance on the fact that the officers thought that Alvin appeared alarmed and bent down in front of his car after identifying the police car is buttressed by a citation to *United States v. Peterson*.[20]  Here again, the facts are so distinguishable that Alvin might have convincingly pointed to *Peterson* as an example of the kind of articulable suspicion needed for a *Terry* stop.

In *Peterson*, the arresting officers were aware that security guards had been involved in thefts.[21]  On the evening in question, police saw defendant Shawn Peterson and two other men duck behind a car that did not belong to them when the police approached in an unmarked car and plain clothes.[22]  One of the men identified himself as a security guard during the ensuing conversation.[23]  As Peterson approached, police noticed a bulge in a knapsack that he was carrying on his back.  When asked about the knapsack's contents, Peterson curiously responded: "[W]hat knapsack?"[24]  The officers told him that they were referring to the knapsack on his back, and he then voluntarily

---

[19] *Id.* at 562.  For example, the police in *Goodrich* responded to what was tantamount to "a theft in progress" within seven minutes of receiving a tip regarding a theft. *Id.* at 554 ("They arrived . . . within seven minutes of [the informant's] call . . . .").

[20] 100 F.3d 7 (2d Cir. 1996).

[21] *Id.* at 9.

[22] *Id.*

[23] *Id.*

[24] *Id.*

handed it over to them and allowed them to search it while proclaiming, "it's not my knapsack."[25] During the ensuing suppression hearing, Peterson conceded that "his encounter with the officers began as a consensual interview."[26]

It is then clear that the fact that the men had ducked behind the car was not dispositive to the officers' justification for seizing or detaining them. There was neither seizure nor detention until after circumstances—that evolved from a consensual interview and conversation—gave police sufficient information to form the basis of the probable cause necessary to seize him. That is simply not the case here.[27]

Clearly, "not every slouch, crouch, or other supposedly furtive movement justifies a stop."[28] This may be especially true in proverbial "high-crime" areas, where residents may simply want to avoid encounters with police for reasons unrelated to any criminal conduct on their part.[29] Nevertheless, the Government relies on *Peterson* and attempts to distinguish Alvin's actions as "involv[ing] more pronounced movement and actions,"

---

[25] *Id.*

[26] *Id.* at 10.

[27] We are reviewing a *Terry* stop, not a consensual encounter, or a consensual search leading to a seizure based upon probable cause. Not surprisingly, *Peterson* did not discuss *Terry* because the circumstances clearly established a consensual interview followed by a consensual search that lead to the discovery of guns inside of the knapsack. Indeed, *Terry* is only mentioned in passing as part of a parenthetical accompaniment to a citation. *See id.* at 10–11.

[28] *United States v. Woodrum*, 202 F.3d 1, 7 (1st Cir. 2000).

[29] "Behavior that appears evasive could . . . have any number of innocent explanations." *United States v. Hill*, 752 F.3d 1029, 1036 (5th Cir. 2014). That is no less true for such behavior in "high-crime" areas.

thereby rendering his actions less ambiguous and more suspicious.[30]  But, as we have

explained, the circumstances here are not comparable.[31]

We realize, of course, that "nervous, evasive behavior is a pertinent factor in

determining reasonable suspicion."[32]  We nevertheless resist the implicit invitation to

elevate nervousness—or even an isolated evasive act—to the level that would allow

police to detain anyone whom they conclude is nervous or trying to avoid them as they

approach.[33]  Moreover, even if Alvin did appear nervous, or "startled," as Officer

Carvalho testified, "[i]t is certainly not uncommon for most citizens—whether innocent

or guilty—to exhibit signs of nervousness when confronted by a law enforcement

officer."[34]

---

[30] Appellee's Br., at 27–28.

[31] *See also United States v. Valentine*, 232 F.3d 350, 357 (3d Cir. 2000) (concluding that "the officers had reasonable suspicion after they received the face-to-face tip, were in a high-crime area at 1:00 a.m., and saw [the defendant] and his two companions walk away as soon as they noticed the police car").

[32] *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000).

[33] *Wardlow*, on which the Government also relies and often cites in an attempt to base articulable suspicion or even probable cause on a defendant's flight, is not to the contrary. Although that case's facts are often overlooked, in *Wardlow*, police were traveling in a caravan as they approached an area known for drug sales and weapons. *Id.* at 121. Moreover, "they expected to find a crowd of people in the area, including lookouts and customers." *Id.*  With these expectations informing their observations, they saw William Wardlow, the defendant, flee, "holding an opaque bag." *Id.* at 121–22.  They apprehended him and "immediately conducted a brief protective patdown search for weapons because . . . it was common for there to be weapons in the near vicinity of narcotics transactions." *Id.* at 122.  When police "squeezed the bag [Wardlow] was carrying," they noticed it contained a hard and heavy object that they believed to be a gun. *Id.*  This gave police probable cause to arrest Wardlow. *Id.* at 122, 126.  However, as the facts show, before they gave chase, they had reason to believe that he was either a lookout or a seller of drugs. *Id.* at 121.

[34] *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997).

Lastly, we address the Government's contention that officers' "training and observations led them to suspect that Alvin might be engaging in criminal activity."[35] We do "give considerable deference to police officers' determinations of reasonable suspicion,"[36] but courts do not owe them "blind deference."[37] Nor can we accept any suggestion that the officers' training should somehow be allowed to elevate ambiguous circumstances to the reasonable suspicion required for a *Terry* stop. After all, that training includes (or should include) awareness of the constitutional limitations the Fourth Amendment imposes.

Considering these circumstances as a whole,[38] we conclude that the District Court erroneously determined that the officers articulated sufficient facts supporting reasonable suspicion to justify stopping Alvin.

### III

For the reasons set forth above, we hold that the District Court erred in denying Alvin's Motion to Suppress. We will therefore reverse that order and remand for further proceedings.

---

[35] Appellant's Br., at 26.
[36] *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006).
[37] *Woodrum*, 202 F.3d at 7.
[38] *See United States v. Arvizu*, 534 U.S. 266, 273 (2002) (stating that reviewing courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing" (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981))).