

Villanova University School of Law
Villanova University School of Law Digital Repository

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-20-2006

# USA v. Goodrich

Precedential or Non-Precedential: Precedential

Docket No. 05-3071

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Goodrich" (2006). *2006 Decisions.* Paper 789.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/789

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 05-3071
_____

UNITED STATES OF AMERICA,

vs.

JERVIS LAVERN GOODRICH

Appellant
_____

On Appeal from the United States District Court
For the Middle District of Pennsylvania
(D.C. Criminal No. 03-cr-00036)
District Judge: Honorable John E. Jones, III
_____

Argued May 16, 2006

Before: MCKEE and GARTH, *Circuit Judges*, and
LIFLAND, *District Judge**

(Filed: June 20, 2006)

_____

* The Honorable John C. Lifland, Senior District Judge for the District of New Jersey, sitting by designation.

MICHAEL G. LEONARD, ESQUIRE (ARGUED)
Law Office of Michael G. Leonard
91 North Main Street
Hughesville, Pennsylvania 17737

      Counsel for Appellant

WILLIAM A. BEHE (ARGUED)
Office of United States Attorney
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108

GEORGE J. ROCKTASHEL, ESQUIRE
Office of United States Attorney
240 West Third Street, Suite 316
Williamsport, Pennsylvania 17701

      Counsel for Appellee

_____

OPINION OF THE COURT
_____

GARTH, *Circuit Judge*.

State police officers, acting upon a non-specific tip, stopped a vehicle in the immediate vicinity of a reported theft in progress. We address the constitutionality of this investigatory stop under the "reasonable suspicion" standard of *Terry v. Ohio*,

392 U.S. 1 (1968), and its progeny. We hold that, notwithstanding the vague and imprecise description provided by the informant in this case, other relevant circumstances furnished the police with "reasonable suspicion" to justify the *Terry* stop. We will therefore affirm the District Court's judgment which denied appellant's motion to suppress evidence, but as our opinion explains, we do so for an entirely different reason.

I.

As the "reasonable suspicion" inquiry is highly fact-dependent in nature, we proceed to describe the facts relating to the vehicle stop in some detail, placing sole emphasis on those events preceding the stop. We preface this factual discussion, however, by noting that both the District Court and the parties refer to many facts having little or no relation to the vehicle stop. Such facts were deemed relevant in the proceedings below because the District Court erroneously held that *Terry* did not authorize the stop and therefore proceeded to consider the application of the exclusionary rule to the contested evidence. It ultimately denied the suppression motion, concluding that the contested evidence should nonetheless be admitted under certain exceptions to the exclusionary rule. Our analysis does not proceed beyond the constitutional principles governing the investigatory stop. Because we uphold the validity of the stop, we have no occasion to reach or address the alternate theories relied upon by the District Court in denying the suppression motion.

A.

Mill Hall is a small town in Clinton County, Pennsylvania. Situated along the railroad tracks in a mixed residential and commercial part of town, directly adjacent to Mill Hall Clay Products and diagonally across the railroad tracks from R&M Gas & Oil ("R&M Gas"), is Webb's Super-Gro ("Webb's"), a farm supply company which sells anhydrous ammonia, among other agricultural products. Anhydrous ammonia is a chemical used in agricultural industries, but also frequently employed in the production of methamphetamine. As a result of repeated thefts of anhydrous ammonia from Webb's tanks, the police viewed the surrounding vicinity as a "hot spot" for criminal activity. App. 246.

On the night of September 10, 2002, at approximately 11:20 p.m., the Pennsylvania State Police Barracks in Lamar, Pennsylvania received a call from an employee at Mill Hall Clay Products, reporting a possible theft in progress from Webb's anhydrous ammonia tanks. The caller identified himself as Todd Gentzyel ("Gentzyel"), a third-shift kiln operator at the brickyard adjacent to Webb's. Gentzyel previously had informed the Lamar Barracks of similar thefts and had been advised to call the state police immediately upon witnessing any suspicious activity in the future. He told the police communications officer ("PCO") that, ". . . there was two people just carrying some kind of buckets or something across from the Webb's . . . and they're just, they're over behind R&M Gas right now loading into some kind of a vehicle. I'm gonna go try to

-4-

get a description." App. 392. The PCO directed Gentzyel to call back when he obtained a description, and then immediately dispatched Troopers Stephen Wilcox and Christopher Soo from the Lamar Barracks to R&M Gas. The PCO also dispatched Trooper David Kirkendall, already out on patrol, to the scene. At 11:21 p.m., the PCO repeated to one of the responding troopers that the suspects were behind R&M Gas. App. 392.

Having responded to numerous incidents at Webb's on prior occasions and having conducted routine surveillance of the anhydrous ammonia tanks on the property, Troopers Wilcox and Soo were both familiar with the location of R&M Gas and the surrounding area. App. 110, 157. They arrived in Mill Hall within seven minutes of Gentzyel's call and proceeded down Pennsylvania Avenue – the main roadway running through Mill Hall – in the direction of R&M Gas. As they drove down Pennsylvania Avenue, the troopers observed no vehicles coming from the direction of R&M Gas. App. 117. However, as they turned right onto Agnew Street – one of the side streets intersecting Pennsylvania Avenue – in order to approach R&M Gas, they immediately spotted a small, dark-colored vehicle in front of R&M Gas about a block and a half ahead. No other occupied vehicles were in the area. App. 199.

At approximately 11:28 p.m.,[1] Troopers Wilcox and Soo

---

[1] The District Court found that the stop occurred at approximately 11:28 p.m. The government, however, states that a trooper had pulled over the vehicle in question at 11:26:59

pulled in front of the vehicle and activated their lights, causing the vehicle to stop. At about the same time, Trooper Kirkendall arrived from another direction and stopped behind the vehicle. The government does not dispute that this initial stop constitutes a seizure for *Terry* purposes.

Meanwhile, just prior to the stop, at precisely 11:26:44 p.m., Gentzyel called back and reported to the PCO that the vehicle had just pulled out "over by R&M Gas." App. 395. He believed, though he was not certain, that the occupants looked like two women, and he described the driver as a "blond-haired lady." App. 396. He then advised the PCO that the troopers had, in fact, pulled over the vehicle he was describing. App. 396. As the stop occurred, Gentzyel remained on the telephone line, providing further descriptions to assist the officers in their investigation. In particular, Gentzyel told the PCO the following additional information:

> I fire the kilns on third shift and when I walked out they come across our parking lot. There was two people, two individuals carrying, it looked like buckets of something. They walked across the railroad tracks and went over to R&M Gas. Over behind the R&M gas plant, and then they were loadin' stuff for about five minutes. I hurried up and run in and made a call, went back out to see if I

---

p.m. – the time that Trooper Kirkendall radioed in the license plate number of the vehicle. App. 395. The government appears to be correct as to the precise time of the stop.

could get a description of the vehicle.

App. 397. Gentzyel also described the vehicle in question as a smaller, dark-colored vehicle, like a Cavalier, and reported that he saw the two persons "really struggling" with the container as they carried and loaded it into the rear of the car. App. 400-02.

Immediately after the stop, Trooper Soo exited his vehicle and ran down the street to R&M Gas to check for other vehicles or individuals in the area. He observed no other activity in the area. However, between the stopped vehicle and R&M Gas, he encountered a strong smell of ammonia and noticed a substance scattered on the street with a cup and spoon located nearby. To the troopers, it appeared as if the cup and spoon had been thrown from the vehicle prior to the stop. App. 369.

The troopers then spoke with the occupants – later identified as Jervis Goodrich ("Goodrich"), defendant below, appellant here, who occupied the passenger seat, and his girlfriend Melissa Kinne ("Kinne"), the driver and owner of the vehicle – to determine if they had seen anything suspicious in the area. Goodrich and Kinne responded in the negative, and further told the troopers that they had been "parking" at R&M Gas. The troopers, however, observed within the vehicle in plain view tools and rags, a pliers, and a flashlight. From their prior experience, the troopers knew that these things were commonly used during anhydrous ammonia thefts. App. 130-31, 366-67. Moreover, at least one of the occupants matched

Gentzyel's description of "a blonde-haired lady" and the car generally matched his description of a small, dark-colored vehicle, which information the troopers had received on police radio during the investigatory stop.

At some point, the troopers asked about the trunk of the car. Goodrich stated that he had gone into the trunk to retrieve a blanket. App. 129-30. The troopers thereupon requested permission to search the trunk, at which point Goodrich claimed that the key had broken off in the trunk lock and that he had used pliers in retrieving the blanket from the trunk. Upon examination, however, the troopers saw no key broken off in the lock. App. 132. Kinne, in turn, had told one of the troopers that she had lost the key to the trunk. App. 135. And when a trooper suggested that she turn off the car to prevent it from overheating, Kinne turned off the ignition and placed the keys in her waistband, thereby further arousing the troopers' suspicion. App. 135-36.

After conducting a National Crime Information Center check of the vehicle's license plate number and after running Goodrich's and Kinne's names and dates of birth through law enforcement databases, the troopers learned that there was an outstanding parole warrant in New York for Goodrich. He was thereupon taken into custody.

At this juncture, Gentzyel was brought to the scene and identified the vehicle and the occupants as the same vehicle and persons that he observed earlier in the evening. Based on Gentzyel's identification and the other information gathered

-8-

during the investigatory stop, the troopers believed probable cause existed to arrest Goodrich and Kinne for theft of anhydrous ammonia. Accordingly, they placed Kinne in custody, and informed both Goodrich and Kinne of their intent to file theft and drug charges. And yet despite their belief that probable cause existed for the arrests, the troopers waited for the issuance of a warrant to search the inside of the vehicle.[2]

## B.

The United States subsequently charged Goodrich with (1) conspiracy to manufacture and distribute controlled substances, contrary to 21 U.S.C. § 846, (2) theft of anhydrous ammonia, contrary to 21 U.S.C. § 864(a)(1), (3) possession of listed chemicals, contrary to 21 U.S.C. § 841(c)(1), and (4) distribution of a controlled substance, contrary to 21 U.S.C. § 841(a)(1). On February 13, 2003, a grand jury sitting in the Middle District of Pennsylvania

---

[2] On September 11, 2002, the day following the investigatory stop, the troopers applied for and obtained a search warrant to search Kinne's vehicle. Upon searching the vehicle, they found a plastic spoon with white powdery residue on it, a plastic container containing an off-white chunky powder, an empty plastic container with a metal sprout, two cans of starter fluid, and a 20 gallon propane tank filled with anhydrous ammonia. Laboratory analysis revealed that the residues and contents of the objects included methamphetamine and two chemicals used to make methamphetamine, pseudoephedrine and ether.

returned a four-count indictment against Goodrich on these charges. The United States brought no charges against Kinne, who entered a guilty plea to state theft charges and agreed to cooperate with the authorities.[3]

Before trial, Goodrich moved to suppress any and all evidence obtained as a result of the stop,[4] arguing that the police lacked reasonable suspicion to perform the *Terry* stop. He also argued that the police lacked probable cause to either arrest him or search the vehicle, as the facts used to support

---

[3] On October 15, 2002, Kinne agreed to an interview with the district attorney and the state police. With her counsel present, she admitted driving Goodrich to Webb's and assisting him in stealing anhydrous ammonia. Kinne later testified against Goodrich at a state court preliminary hearing. She also testified at Goodrich's trial in this case.

In addition, Kinne turned over to the police prison letters from Goodrich. In these letters, Goodrich told Kinne what to say to investigators concerning the location of the tanks, and he repeatedly urged her to "stick to the story." In one letter, Goodrich complained about how the anhydrous ammonia burned his hands. In another notable letter, Goodrich admitted that the propane tank recovered from Kinne's vehicle belonged to him.

[4] Goodrich moved to suppress the physical evidence seized from Kinne's vehicle, Kinne's inculpatory testimony, and the letters addressed to Kinne from Goodrich and turned over to the government.

probable cause had been obtained from an illegal stop. On January 21, 2004 and February 3, 2004, the District Court conducted hearings on the suppression motion.

At the hearings, the government presented the testimony of Trooper Soo. Among others, Goodrich presented the testimony of Trooper Wilcox. Soo testified that the police decided to conduct an investigatory stop of the vehicle based primarily on its geographical proximity to the reported theft in progress. He admitted that the troopers had no specific description of either the suspects or the vehicle prior to the stop. Soo further testified that the troopers would have stopped any vehicle in the near vicinity of R&M Gas. Indeed, he testified on cross-examination that had he seen three vehicles in the area, he would have tried to stop all three. App. 167-68. Trooper Wilcox concurred, stating that the troopers had stopped Kinne's vehicle because it was the only vehicle in the area.

Based on the foregoing testimony, the District Court concluded that the stop was unlawful. The District Court explained:

> The informant in this case . . . did not provide any specific description of the individuals or vehicle in question *until the police had already stopped the vehicle*. Notably, the candid testimony of both Troopers Soo and Wilcox indicates that they would have stopped any vehicle or person they encountered within a two or three block area of R&M Gas. Trooper Soo also testified that he had *no other evidence* that the vehicle was involved in

-11-

criminal activity other than its location proximate to whether [sic] the activity had been observed. . . . Quite clearly, the lone fact that a vehicle is proximate to an area of reported criminal activity is not sufficient to support a finding of reasonable suspicion and the stop is, therefore, impermissible.

District Court Opinion at 8-9.

Having found that *Terry* did not authorize the investigatory stop, the District Court proceeded to consider whether any exceptions to the exclusionary rule were applicable. It found that there were, concluding that the independent source and the attenuated connection principles, both exceptions to the general exclusionary rule, supported the admissibility of the challenged evidence. Accordingly, the District Court denied Goodrich's motion to suppress.

Goodrich's case thereupon proceeded to trial. On August 10, 2004, a jury convicted Goodrich on the first two counts of the indictment – conspiracy to manufacture and distribute controlled substances and theft of anhydrous ammonia – and found him not guilty on the remaining counts. On June 10, 2005, the District Court sentenced Goodrich to 71 months imprisonment and 6 years of supervised release and imposed a special assessment of $200 and restitution of $4,500. This timely appeal followed.[5]

---

[5] We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. We review the denial of a suppression motion for clear

II.

Goodrich challenges the denial of his suppression motion, essentially arguing that the contested evidence should have been suppressed as the fruits of an illegal stop. He contends that the District Court erred in its application of the exclusionary rule and the exceptions relevant thereto, though he applauds the District Court for finding an initial constitutional violation. The government argues that the District Court erred in finding the stop unlawful, but performed the correct analysis in admitting the challenged evidence under the applicable exceptions to the exclusionary rule.

Both parties agree that the pivotal issue in this appeal is whether the automobile stop ran afoul of the Fourth Amendment. If the stop is found to be lawful, that is, if the officers had "reasonable suspicion" to stop the Kinne vehicle, we need go no further respecting the exclusion of evidence: the evidence should have been allowed as no Fourth Amendment violation occurred.

We therefore turn to address the primary question presented in Goodrich's appeal: whether the vehicle stop

---

error as to the underlying facts, but exercise plenary review as to its legality in light of the district court's properly found facts. *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003). We can affirm a district court's denial of a suppression motion on any ground supported by the record. *United States v. Agnew*, 407 F.3d 193, 196 (3d Cir. 2005).

satisfied the constitutional requirements set forth in *Terry v. Ohio*, *supra,* and subsequent case law.  In doing so, we examine only the validity of the *initial* stop, for Goodrich does not separately challenge the reasonableness or intrusiveness of the investigation following the stop.[6]   As the initial stop, and

[6] In determining whether an investigatory stop is legal, the court also examines its relative intrusiveness.  *United States v. Rickus*, 737 F.2d 360, 366 (3d Cir. 1984) (citing *Terry*, 392 U.S. at 18 n.15)).  *Terry* itself recognized that "in determining whether the seizure and search were 'unreasonable' our inquiry is a dual one – whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." 392 U.S. at 19-20.  Goodrich, however, does not challenge the scope or intrusiveness of the investigation following the stop. Thus only the initial stop, and not the subsequent investigation (or search), is at issue here.

In any event, the record plainly indicates that the troopers conducted a reasonable and minimally intrusive investigation following the stop.   The informant provided real-time information that the troopers had pulled over the right vehicle, and the troopers took every opportunity to acquire a more specific description from the informant; the troopers found a spilled substance smelling of ammonia near the scene; they noticed suspicious equipment in plain view in the car; the occupants of the vehicle behaved in a suspicious manner, especially concerning the trunk to the car; the troopers conducted routine checks on law enforcement databases and

nothing else, constitutes the alleged constitutional violation, the facts and circumstances known to the troopers *preceding* the vehicle stop acquire particular salience. We conclude, after considering all relevant circumstances, that the stop was lawful.

A.

The Supreme Court, in *Adams v. Williams*, stated that "the Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." 407 U.S. 143, 145 (1972). On the contrary, the Court explained, "it may be the essence of good police work to adopt an intermediate response," *i.e.*, to maintain the status quo with a brief stop that allows the police officer to

---

relied upon an outstanding warrant in taking Goodrich into custody; and the informant was eventually brought to the scene to identify the vehicle and occupants as the ones which he spotted earlier in the night. Only after all this investigation did the troopers take Kinne into custody and advise both Kinne and Goodrich of their intent to file theft and drug charges. And finally, it bears mention that the police waited until obtaining a search warrant to search Kinne's vehicle.

Moreover, nothing in the record suggests that the troopers attempted to harass or intimidate the occupants. Nor does the record suggest that the stop involved public embarrassment or physical contact. In short, the investigation did not exceed the extent of inquiry reasonably justified by the circumstances.

-15-

investigate further the possibility of criminal involvement. *Id.* at 145-46. In *Terry*, the Supreme Court had earlier held that such an investigatory stop – now commonly referred to as a *Terry* stop – is consistent with the Fourth Amendment whenever the police officer has a reasonable, articulable suspicion that criminal activity is afoot. *Terry*, 392 U.S. at 30; *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

We recently summarized the familiar precepts which govern the "reasonable suspicion" inquiry:

> Reasonable suspicion is an 'elusive concept,' but it unequivocally demands that 'the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.' *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). An officer's objective basis for suspicion must be particularized because the 'demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence.' *Terry*, 392 U.S. at 22 n. 18. At the same time, we must allow 'officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.' *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted); *see also United States v. Nelson*, 284 F.3d 472, 476 (3d Cir. 2002) . . . In evaluating whether there was an objective basis for reasonable suspicion, we consider 'the totality of the circumstances-the whole picture.' *Cortez*, 449 U.S. at 417.

*United States v. Brown*, --- F.3d ----, 2006 WL 1377043, *6 (3d Cir. May 22, 2006).

Here we only emphasize that the "reasonable suspicion" analysis is objective; subjective motive or intent is not relevant for *Terry* purposes. *See Terry*, 392 U.S. at 21-22 (1968) (when evaluating the "reasonableness of a particular search or seizure . . . it is imperative that the facts be judged against an *objective standard*: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?") (citation and internal quotations omitted) (emphasis added). We also note that "reasonable suspicion" is measured before the search; information acquired subsequent to the initial seizure cannot retroactively justify a *Terry* stop. *Florida v. J.L.*, 529 U.S. 266, 271 (2000) ("The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search."); *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003) ("[U]nder *Terry*, in evaluating whether [the officer's] interaction with [the defendant] prior to his arrest amounted to an unreasonable seizure, we must first determine at what moment [the defendant] was seized, and then whether that seizure was justified by reasonable, articulable facts known to [the officer] as of that time . . ."); *United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000) ("[I]t is true that the 'reasonableness of official suspicion must be measured by what the officers knew before they conducted their search'") (quoting *J.L.*, 529 U.S. at 271).

Where, as here, the *Terry* stop is made primarily upon the basis of information supplied to the police by an informant, a central issue is whether the informant's information is sufficiently reliable and complete to provide the police with

-17-

"reasonable suspicion" in stopping the designated persons or vehicles for investigation. In evaluating "reasonable suspicion" in this context, the court considers both the reliability of the tip or informant and the content of the tip. *See Valentine*, 232 F.3d at 355 ("The reliability of a tip, of course, is not all that we must consider in evaluating reasonable suspicion; the content of the tip must also be taken into account, as well as other surrounding circumstances."). The content of the tip, concomitantly, must provide a particularized and objective basis for suspecting (1) the particular persons stopped (2) of criminal activity. *See J.L.*, 529 U.S. at 272 ("The reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person.").

In this appeal, Goodrich does not challenge the reliability of the tip itself or the informant.[7] Rather, Goodrich challenges the *quality*, or the information contained in, the tip. He argues that it lacked the requisite degree of specificity to justify the vehicle stop. In so arguing, he challenges the information contained in the tip as to both essential components, *viz.*, its

---

[7] Gentzyel was a known informant providing real-time information based upon his personal observation of suspicious behavior, which matched a pattern of criminal activity known to the police. *See Adams*, 407 U.S. at 146-47 (noting the reliability problems of anonymous telephone tips and distinguishing anonymous tips from a known informant whose reputation can be assessed and whose information is immediately verifiable at the scene) and *compare United States v. Roberson*, 90 F.3d 75, 79 (3d Cir. 1996) (holding that an anonymous tip containing only information readily observable at the time the tip is made, and thus lacking any indicia of reliability or predictive value, does not provide reasonable suspicion for a *Terry* stop).

tendency to (1) identify determinate persons (2) engaging in criminal activity. We examine each of these components below, turning first to Goodrich's principal contention that the police had no specific descriptions of either the suspects or the vehicle in question.

B.

It is well established that "an officer cannot conduct a *Terry* stop simply because criminal activity is afoot." *United States v. Brown*, 159 F.3d 147, 149 (3d Cir. 1998). "Instead, the officer must have a particularized and objective basis for believing that *the particular person* is suspected of criminal activity." *Id.* (citing *Cortez*, 449 U.S. at 417-18) (emphasis added). Goodrich argues that the police acted solely upon the information contained in Gentzyel's first report[8] and thus without a specific description of either the suspects or the getaway vehicle. This information, Goodrich contends, was too imprecise to satisfy constitutional standards. We cannot agree.

---

[8] In that report, Gentzyel told the PCO that, ". . . there was two people just carrying some kind of buckets or something across from the Webb's . . . and they're just, they're over behind R&M Gas right now loading into some kind of a vehicle. I'm gonna go try to get a description." Although Gentzyel provided additional information in the second call to the troopers, it is unclear from the record whether any of the information he gave to the officers was given simultaneous to the stop or immediately after the stop. Accordingly, we will examine the constitutionality of the stop based solely on the information provided in Gentzyel's first report and the other relevant factors which we describe herein. We express no opinion on whether information afforded simultaneous to the stop may be considered for *Terry* purposes.

-19-

Other relevant circumstances can provide sufficient particularity or specificity to an otherwise general or indefinite description. A description, in other words, must be considered with reference to the totality of the circumstances. As one commentator explained:

> Whether the available description is sufficiently particular cannot be determined in the abstract. To suffice, the description must permit the police to be reasonably selective in determining who to stop for investigation, and whether this may be said to be the case will depend upon how many persons are in the universe of potential suspects.

6 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 9.5(g) (4th ed. 2004) (footnotes omitted). Accordingly, the imprecise description provided by the informant in this case must be considered alongside any other relevant factors which tend to more narrowly define the universe of potential suspects and thereby constrain police discretion. At least four such factors warrant consideration in this case: (1) the reputation of the area in which the stop occurred for criminal activity; (2) the time of day; (3) the geographical and temporal proximity of the stop to the scene of the alleged crime; and (4) the number of persons in the area. We discuss these factors *seriatim*.

## 1. High Crime Area

"An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Wardlow*, 528 U.S. at 124 (citing *Brown v. Texas*, 443 U.S. 47 (1979)). However, the Supreme Court has noted "the fact that

the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Id.* (citing *Adams*, 407 U.S. at 144) ; *see also Brown*, 159 F.3d at 149-50 (noting that reputation of area for criminal activity is a relevant *Terry* factor).

Here, Goodrich was found in the near vicinity of Webb's and R&M Gas, an area with a reputation for theft of anhydrous ammonia. Trooper Soo testified that the Pennsylvania State Police had responded to ten to fifteen reported thefts of anhydrous ammonia from Webb's tanks preceding Goodrich's arrest. Contrary to Goodrich's contention, then, the record indicates that the area around R&M Gas constitutes a "high crime area" for *Terry* purposes. *See, e.g. United States v. Rickus*, 737 F.2d 360, 362, 365 (3d Cir. 1984) (noting that area recently victimized by twelve unsolved burglaries was area of criminal activity for *Terry* purposes). We thus conclude that the reputation of the area for prior thefts of anhydrous ammonia was one articulable fact upon which the troopers may legitimately have relied in conducting the stop. This fact, moreover, is given greater importance when considered with the next relevant consideration – the time of day.

## 2. Time of Day

The investigatory stop occurred at approximately 11:30 p.m. The lateness of the hour of the stop further supports the inference of criminal activity, especially when considered alongside the area's reputation for criminal activity. *See, e.g., Michigan v. Long*, 463 U.S. 1032, 1050 (1983) (noting that "the hour was late" as one relevant *Terry* circumstance); *United States v. Ramires*, 307 F.3d 713, 716 (8th Cir. 2002) (listing the fact that "it was late at night" as one circumstance justifying a *Terry* stop); *United States v. Lender*, 985 F.2d 151, 154 (4th Cir.

1993) ("The lateness of the hour is another fact that may raise the level of suspicion.").

This case, therefore, does not present the situation, raising constitutional concern, where the police perform a *Terry* stop in an otherwise tranquil neighborhood during the daylight hours based only on a general description.[9]  The lateness of the hour and the reputation of the area for criminal activity move this case closer to the elusive line separating constitutional from unconstitutional governmental action, but it is the next two factors which, in our view, place this case squarely on the constitutional side of the divide.

### 3.  Temporal & Geographical Proximity

The informant in this case, Todd Gentzyel, reported at approximately 11:20 p.m. that two persons were carrying "buckets or something across from Webb's," and "they're over behind R&M Gas right now loading into some kind of vehicle." The troopers responded immediately and stopped Kinne's vehicle within seven minutes of the report.  In addition, the stop occurred in the immediate vicinity of the reported theft in progress.  The record indicates that Troopers Wilcox and Soo stopped Kinne's vehicle within one or two blocks of R&M Gas. Hence, Goodrich was found near in time and geographic proximity to the reported theft.

*United States v. Juvenile TK*, 134 F.3d 899 (8th Cir. 1998), is instructive here.  There, the police received two

---

[9] *Compare United States v. Kerr*, 817 F.2d 1384, 1387 (9th Cir. 1987) ("loading boxes into a vehicle on residential property at mid-afternoon, a time of day not raising an inference of criminal activity").

dispatches, forty minutes apart, that a man had broken into a gray vehicle and brandished a gun. The police had no license plate number for the vehicle in question, but the second dispatch located the suspect at a particular gas station. About seven minutes after the second dispatch, the police noticed a gray vehicle making a U-turn in a commercial parking lot about one-and-a-half blocks to two blocks from the gas station identified in the second dispatch. The police proceeded to stop the vehicle, which had three occupants. Two of the occupants were arrested for violating the curfew law and for public intoxication. No weapon was ever discovered.

After the United States charged one of the occupants with various crimes, including robbery and assault with a dangerous weapon, the occupant moved to suppress any evidence seized or gathered as a result of the stop, arguing that the police lacked reasonable suspicion in making the stop. On appeal, the Eighth Circuit affirmed the validity of the stop, relying in significant part on the "temporal and geographical proximity of the car to the scene of the crime." 134 F.3d at 903-04.

Other cases have reached similar conclusions, sustaining the detention of an individual found in the proximity of a recently perpetrated offense. *See, e.g., United States v. Brown*, 334 F.3d 1161, 1165 (D.C Cir. 2003) (suspects' car found parked in lot where late night shots had been fired; location relevant *Terry* factor); *United States v. Wimbush*, 337 F.3d 947, 950 (7th Cir. 2003) (noting as a relevant factor the fact that suspect was found eight blocks away from reported crime); *Brown*, 159 F.3d at 150 (suspect's presence in "close proximity to the crime scene a few minutes after the [report]" a factor supporting finding of reasonable suspicion); *United States v. Raino*, 980 F.2d 1148, 1150 (8th Cir. 1992) (holding that a *Terry*

-23-

stop was supported by the fact that "the officers were responding to a late-night call that shots had been fired in precisely the area appellant's car was parked"). Accordingly, it is clear to us that the geographical and temporal proximity of Kinne's vehicle (and therefore Goodrich himself) to the scene of the reported theft in progress is another important factor militating strongly in favor of the validity of the stop.

### 4. Number of Persons in Area

Troopers Wilcox and Soo both testified that they observed no other occupied vehicles in the vicinity of R&M Gas prior to the stop. The absence of any other vehicles in the area was another fact known to the troopers at the moment of the stop, supporting the reasonable belief that the occupants of the vehicle were probably the perpetrators. Perhaps this case would have been different had there been two, or three, or four other vehicles in the area prior to the stop.[10] As it was, however, no other vehicles were in the area.

---

[10] Both Goodrich and the District Court place particular emphasis on the testimony of Troopers Soo and Wilcox that they would have stopped any vehicle within a several block radius of R&M Gas. However, as we have stated, the "reasonable suspicion" analysis is objective. *See Terry*, 392 U.S. at 21-22 (1968). The Supreme Court, moreover, recently reiterated the basic principle that the subjective motivations of officers are not relevant to determining whether governmental conduct violates the Fourth Amendment. *See Brigham City, Utah v. Stuart,* --- S.Ct. ----, 2006 WL 1374566, *4 (May 22, 2006). It is therefore irrelevant that Trooper Soo may have testified that had he seen three vehicles in the area, he would have tried to stop all three.

*United States v. Moore*, 817 F.2d 1105 (4th Cir. 1987), is similar to this case in several respects. There, the court upheld the validity of a stop and frisk where there was no description of the perpetrator. Within two or three minutes of a purported burglary, the police noticed the defendant within 30 or 40 yards of the site of the apparent burglary. The police stopped and frisked the defendant, uncovering a concealed weapon. The defendant was then arrested. In upholding the validity of the stop, the Fourth Circuit emphasized that the "appellant was the only person in the vicinity." 817 F.2d at 1107. The court also noted the following relevant considerations: (1) only two or three minutes had elapsed from the dispatcher's report, (2) the call came late at night, and (3) the area was a "high crime neighborhood." *Id.* "These circumstances," the court concluded, "in combination support a reasonable suspicion that appellant was involved in the break-in." *Id.*

We, too, conclude that even without a detailed description of either the suspects or their vehicle, there were enough objective facts present here to provide "reasonable suspicion" to warrant the *Terry* stop. Indeed, upon considering each of the foregoing factors, we are persuaded that the troopers would have been remiss had they declined to investigate the occupants of Kinne's vehicle.[11]

---

[11] We inquired at oral argument as to what other course of action the troopers should have taken. It was suggested that the officers could have followed the vehicle until they obtained a more precise description from the informant. Yet the course of action taken by the troopers here, given the particular circumstances, passes the *Terry* test, which as stated requires only "reasonable suspicion."

## C.

Finally, this court has reiterated that the activity of which the detainee is suspected must actually be *criminal*. *See United States v. Ubiles*, 224 F.3d 213, 218 (3d Cir. 2000). Goodrich argues that the police had no reason to believe that criminal activity *of any sort* was afoot. He contends that it is "not illegal to walk through the grounds of Mill Hall Clay Products." App. Br. at 23. In other words, whatever the degree of specificity as to the particular suspects, Goodrich argues that the only information known to the troopers at the relevant time was that two persons were carrying buckets of some kind across from Webb's, a perfectly legal activity. In so arguing, he relies heavily on *United States v. Ubiles*, *supra*. We find such reliance to be misplaced.

In *Ubiles*, the police received information from an anonymous informant that a man was carrying a gun during the J'ouvert Carnival, a periodic celebration in the U.S. Virgin Islands. Based on this information, the police approached the man and proceeded to frisk him, uncovering a loaded gun on his person. The gun was unregistered and its serial number had been obliterated. The United States subsequently charged the defendant with violations of federal gun laws.

In reversing the district court's denial of defendant's motion to suppress, this court emphasized that the authorities had no reason to believe that the defendant was "involved in criminal activity." 224 F.3d at 217. As the court noted, "[i]t is not necessarily a crime to possess a firearm in the Virgin Islands." *Id.* Accordingly, we found that the police lacked reasonable suspicion *of criminal activity* to justify the stop.

*Ubiles* recognized, however, that "[a] reasonable

suspicion of criminal activity may be formed by observing exclusively legal activity." *Id.* What matters is whether the defendant's behavior points to the presence of illegal activity. *Id.* Ubiles had exhibited no unusual or suspicious behavior prior to the stop. Also, there was no evidence to suggest that the officers were "aware of any articulable facts suggesting that the gun Ubiles possessed was defaced or unlicensed, that Ubiles posed a safety risk to the authorities or the [carnival] celebrants, or that Ubiles was acting in a manner indicating that he was involved in a different crime." *Id.* at 218. "For all the officers knew," we there concluded, "even assuming the reliability of the tip that Ubiles possessed a gun, Ubiles was another celebrant lawfully exercising his right under Virgin Islands law to possess a gun in public." *Id.*

This case is far different from *Ubiles*, and more closely resembles *United States v. Valentine*, 232 F.3d 350 (3d Cir. 2000). In *Valentine*, the police received a tip from an anonymous informant that a man was carrying a gun in the area. About 50 to 100 feet north of where the officers met the informant, they spotted a group of men standing in a parking lot, one of whom matched the informant's description of the armed suspect. We affirmed the validity of the subsequent stop and frisk. In so doing, we distinguished *Ubiles,* noting that the suspect was found at 1:00 a.m. in a high crime area known for shootings. 232 F.3d at 356.

Here, Goodrich and Kinne were spotted in the vicinity of a known high crime area near midnight. They were carrying some sort of buckets or containers, walking in the near vicinity of Webb's anhydrous ammonia tanks. They were observed trying to load the containers into a vehicle. Their actions, while perhaps perfectly legal if considered in the abstract, must be

considered from the proper vantage. We have elsewhere noted that, "the Supreme Court has upheld a number of stops based on an officer's observation of entirely legal acts, where the acts, when viewed through the lens of a police officer's experience and combined with other circumstances, led to an articulable belief that a crime was about to be committed." *Johnson v. Campbell*, 332 F.3d 199, 207 (3d Cir. 2003) (discussing *Terry* and *Wardlow*). In view of the lateness of the hour and the reputation of the area for theft of anhydrous ammonia, we have no difficulty concluding that Goodrich's behavior provided reasonable suspicion of criminal activity – *i.e.*, theft of anhydrous ammonia.

## III.

For the foregoing reasons, we hold that the *Terry* stop was the product of "reasonable suspicion" and therefore, this being so, the evidence which Goodrich has challenged was properly admitted. Accordingly, we will affirm the District Court's denial of Goodrich's motion to suppress that evidence.