

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-17-2008

# USA v. Carstarphen

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-3237

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation
"USA v. Carstarphen" (2008). *2008 Decisions.* Paper 351.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/351

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 07-3237

UNITED STATES OF AMERICA

Appellant

v.

VAUGHN CARSTARPHEN

Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal Action No. 06-cr-00152)
District Judge: Honorable Joseph H. Rodriguez

Argued September 22, 2008

Before: BARRY, AMBRO, and GARTH, Circuit Judges

Opinion filed: October 17, 2008

Christopher J. Christie
    United States Attorney
George S. Leone
    Chief, Appeals Division
Steven G. Sanders (Argued)
    Assistant U.S. Attorney
Office of United States Attorney
970 Broad Street, Room 700
Newark, NJ   07102-0000

Deborah P. Mikkelsen, Esquire
Office of United States Attorney
Camden Federal Building & Courthouse
401 Market Street
P.O. Box 2098, 4th Floor
Camden, NJ   08101-0000

      Counsel for Appellant

Maggie F. Moy (Argued)
   Assistant Federal Public Defender
Julie A. McGrain, Esquire
Office of Federal Public Defender
800-840 Cooper Street, Suite 350
Camden, NJ   08102-0000

      Counsel for Appellee

------

OPINION

------

AMBRO, <u>Circuit Judge</u>

Vaughn Carstarphen moved to suppress evidence of a gun as the fruit of an illegal seizure prior to his trial for unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) & (2).  The District Court for the District of New Jersey held a hearing and granted the suppression motion.  The Government appeals that ruling,[1] as it contends the officers had reasonable suspicion prior to the stop and frisk of Carstarphen.  Though this is a close case (and the District Court's opinion is both thorough and well-crafted), we agree with the Government and thus reverse.

------

[1]We have appellate jurisdiction under 18 U.S.C. § 3731.

2

I.    Factual History

At 1:31 p.m. on November 26, 2005, a police dispatch center received the first of two 911 calls from a woman, an occupant of a house located at 2823 Clinton Street in Camden, New Jersey. The first officer to respond to the scene at 1:35 p.m., Officer Joseph McCray, took an in-person report from the caller, Edna Daniels. She stated substantially the same information as in her 911 call: "a group of unknown individuals [were] knocking on [my] door wanting to fight." Officer McCray reported that "the individuals then fled the area prior to my arrival and were unable to be located."

Less than one hour later, at 2:23 p.m., Ms. Daniels called 911 again. This time she identified herself by her first name and complained that several males were fighting outside 2823 Clinton Street, and one of them had a gun. The radio dispatch included a description of two of the men: one wearing a red and black shirt and another wearing a red cap and possessing a firearm.[2] Officers Edgar Feliciano and Damon White, uniformed officers on respective solo patrols, received this dispatch at 2:26 p.m. Each arrived at the scene at approximately 2:35 p.m. (They also both heard the first 911 radio dispatch, but neither officer responded to it.)

When the officers turned onto the 2800 block of Clinton Street, they observed three black males cross the street in front of the house at 2823 and walk toward a parked

[2]There is some discrepancy in the record whether the tip described the clothing of one or two males. This discrepancy does not affect our conclusion. The District Court stated the radio dispatch described two males. We will use that characterization for purposes of our analysis. *United States v. Carstarphen*, No. 06-152, 2007 WL 1851798, at *1 (D.N.J. June 25, 2007).

3

black car. Officer White testified that "they tried to get into the vehicle" when they saw his marked patrol car. (The officers did not see any other males on the block when they arrived, though they saw two females standing outside near the house.) The officers observed one male wearing a red cap, another wearing a black and white jacket, and the third male wearing a black shirt, an army jacket, and a black wool cap. Feliciano and White parked their patrol cars next to the black car to block it from leaving, got out, drew their weapons, and ordered the two males not yet inside the car to stop. Carstarphen was sitting in the driver's seat of the black car, and the police ordered him to get out of the car and put his hands on his head. The officers then confirmed with the dispatch center that the male identified as possessing a gun was wearing a red cap. Officer Feliciano frisked Carstarphen, who did not wear a red cap, after he noticed a bulge on Carstarphen that Feliciano believed, in his experience and training, could be a weapon. Feliciano recovered a loaded gun and arrested Carstarphen after determining he was a convicted felon.

## II.     Discussion

We review the District Court's order granting "the motion to suppress for clear error as to the underlying facts, but exercise[] plenary review as to its legality in light of the court's properly found facts." *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003) (alteration in original) (citation and internal quotations omitted).

### A.     Legal Standard for Reasonable Suspicion

The question at the core of this case is whether the police had reasonable suspicion

4

to stop and frisk Carstarphen. Although the Fourth Amendment search and seizure protections generally require a warrant based on probable cause, *Terry v. Ohio* established that the police can conduct a "brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. 1, 30 (1968)). If the police officers did not have an objective basis for reasonable suspicion, then the District Court properly suppressed the gun retrieved from Carstarphen as a result of the stop and frisk. *See United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) ("Any evidence obtained pursuant to an investigatory stop . . . that does not meet this exception must be suppressed as fruit of the poisonous tree." (citation and internal quotations omitted)). If, on the other hand, the officers had reasonable suspicion, then we must reverse the District Court and remand the case for further proceedings.

Reasonable suspicion requires that police officers have a "particularized and objective basis for believing that the particular person is suspected of criminal activity." *United States v. Brown*, 159 F.3d 147, 149 (3d Cir. 1998). We are required to evaluate the specific facts in each case under the "totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). We evaluate a *Terry* stop and frisk as "two independent actions, each requiring separate justifications. The stop must be based on a suspicion of criminal activity and the frisk[, in this case,] on a reasonable suspicion that the person is armed." *United States v. Flippin*, 924 F.2d 163, 165 n.2 (9th Cir. 1991) (citation omitted) (noting, however, that if the stop is unreasonable, then the whole

5

encounter, including the frisk, is illegally tainted).

###    B.    The Reliability of Edna Daniels's Tip

The primary basis for the stop of Carstarphen was the tip Daniels provided to the police in her two 911 calls.[3]  A tip can serve as the foundation for reasonable suspicion if it is sufficiently reliable.  To be so, it must provide an "objective basis for suspecting (1) the particular persons stopped (2) of criminal activity." *United States v. Goodrich*, 450 F.3d 552, 560 (3d Cir. 2006).  *Brown* fleshes this point out by noting that "[r]easonable suspicion . . . requires that there must be some reason to believe not only that the caller was honest but also that he was well informed."  448 F.3d at 250 (citation and internal quotations omitted).  Even if a tip is not truly anonymous, we can "still borrow underlying principles from the anonymous tip context to evaluate [its] reliability . . . ." *Id.* at 249.

In *Brown*, we noted five specific aspects of a tip that tend to indicate its reliability. First, face-to-face interaction gives the officer an opportunity to appraise the witness's credibility and demeanor. *Id.*  Second, if a tipster's identity is known to police, she can be held responsible if the allegations turn out to be fabricated. *Id.*  Third, is the tip's content information that would not be available to any casual observer? *Id.*  Fourth, has

---

[3]It is undisputed that a stop within the meaning of the Fourth Amendment occurred when the officers drew their guns and ordered Carstarphen out of the car.  In determining whether reasonable suspicion exists, there is one pre-step.  We first pinpoint "when the seizure . . . occurred, as that is the moment the Fourth Amendment becomes relevant." *Brown*, 448 F.3d at 245 (citation and internal quotations omitted) (stating that a seizure occurs when there is either an application of  "physical force to restrain movement" or a "submission to a show of authority" (citation and internal quotations omitted)).

the tipster recently witnessed the alleged criminal activity?  *Id*. at 249–50.  Fifth, does the tip predict what will follow, providing police the "means to test the informant's knowledge or credibility"?  *Id*. at 250.

The District Court compared Daniels to "an anonymous informant, since she never identified to the police that she knew [Carstarphen and the other men], and therefore she gave the officers no reason for believing that she had inside information about the individuals."  *Carstarphen*, 2007 WL 1851798, at *5.  The Court also concluded that the "vague" content of the tip and its inaccuracies further undermined its reliability.  *Id*.  This is where we begin to part ways with the District Court, as we do not believe that Daniels is the "antithesis of a reliable informant."  *Id*.  In fact, Carstarphen does not argue that Daniels should be treated like an anonymous informant.

Using the *Brown* factors for guidance, we conclude that Daniels's tip indeed had indicia of reliability.  Daniels subjected herself to future prosecution for a false report in several ways: she provided personal identifying information, including an address and telephone number in both 911 calls and her name in the second call; she met with Officer McCray face-to-face when he responded to the first call; and she included her name and an address on Officer McCray's police incident report.  Also, the dispatch reports indicate the two 911 calls were substantially similar in content, Daniels made both calls from the same location, and they were within one hour of each other.[4]  In responding to the call,

---

[4]Carstarphen argues that the tip was unreliable in part because the Government did not keep recordings of the actual 911 calls.  Thus, the argument goes, there is no transcript to indicate whether the tip was contemporaneous to the alleged criminal

the officers reasonably could have inferred that Daniels was an eyewitness, her two 911 calls complained about the same group of individuals, and her calls were contemporaneous with the alleged criminal activity.[5] *See United States v. Arvizu*, 534 U.S. 266, 273 (2002) (stating that officers must be allowed to make reasonable inferences and deductions about the cumulative information available to them by drawing on their experience and training). The tip did not provide any predictive information, but Daniels described the clothing of two of the individuals she saw, which the officers' observations later corroborated in part. *See Goodrich*, 450 F.3d at 561 (stating that an imprecise description provided by an informant must be considered alongside any other relevant factors). With this context, Daniels's tip was reliable enough to serve in part as the basis for reasonable suspicion.

### C. Other Factors Under the Totality of the Circumstances

Along with the tip, we look to the other circumstances the police encountered prior to the stop of Carstarphen that would give rise to reasonable suspicion. *United States v. Cortez*, 449 U.S. 411, 417 (1981) (the totality of the circumstances makes up "the whole

---

activity, the calls reported the same group of individuals, or Daniels was actually an eyewitness and saw the gun. The record does include, however, the two 911 dispatch reports, which routinely transmit the substance of 911 calls to patrol officers, the relevant police reports, and the officers' testimony at the suppression hearing. Police officers do not listen to 911 calls in the ordinary course of their jobs; they receive their information from dispatch reports, which are part of our record and a sufficient proxy to use for evaluating the reliability of Daniels's tip.

[5]In fact, the second dispatch report notes that "caller[] states she saw the weapon," which entitles the tip to greater weight. *Brown*, 448 F.3d at 250.

picture"). In *Brown*, we outlined several factors that if observed by police can serve to corroborate a tip: high crime area, late hour, "nervous, evasive behavior" or flight from police, and behavior that "conforms to police officers' specialized knowledge of criminal activity." 448 F.3d at 251–52. We added three other factors in *Goodrich*: temporal and geographic proximity to the reported crime in the tip, and the number of persons observed in the area. 450 F.3d at 561. Not every factor is necessary for reasonable suspicion, however, and, short of all factors, there are no magic combinations that guarantee reasonable suspicion in every case. *Ornelas v. United States*, 517 U.S. 690, 698 (1996) ("[B]ecause the mosaic which is analyzed for a reasonable-suspicion or probable-cause inquiry is multi-faceted, one determination will seldom be a useful precedent for another." (citation omitted)); *United States v. Nelson*, 284 F.3d 472, 478 (3d Cir. 2002) ("The Supreme Court has repeatedly recognized that a reasonable suspicion may be the result of any combination of one or several factors: specialized knowledge and investigative inferences . . . , personal observation of suspicious behavior . . . , information from sources that have proven to be reliable, and information from sources that—while unknown to the police—prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip . . . .").

We agree with the District Court that the close geographic proximity of the suspects to the location in the tip and the absence of other males on the block when the officers arrived are two facts that the officers may legitimately have relied on to conduct

the stop. These circumstances "more narrowly define[d] the universe of potential suspects [to] constrain [the officers'] discretion." *Goodrich*, 450 F.3d at 561.

As to whether the 2800 block of Clinton Street is a high crime area, Officer White testified that it is and that he has participated in arrests involving drugs and guns within a five-block radius. While Officer Feliciano testified that the block is "quiet for the most part," he also stated that he has conducted up to 50 arrests involving drugs within half a block of 2823 Clinton Street and up to 10 arrests involving guns within a three-block radius. The District Court found this to be inconclusive, but we have a different take, as both officers testified that they had participated in multiple gun arrests on and around the 2800 block. This relevant testimony underscores that in investigating calls for help, stopping the suspects here on suspicion of criminal activity was not out of place in this neighborhood.

As noted by the District Court, the suspects' actions are another relevant consideration. Officer White testified that when the suspects saw his patrol car, they tried to get into their car and leave. Crossing the street to get into a car may be completely innocent in most situations, but under the circumstances here the suspects' behavior prior to the stop is an additional factor supporting a reasonable inference of possible criminal activity. *Cf. Brown*, 448 F.3d at 251 (stating one factor supporting reasonable suspicion is evasive behavior); *United States v. Roberson*, 90 F.3d 75, 80 (3d Cir. 1996) (noting that "omissions [in the tip] probably would not have invalidated the stop, if, after corroborating readily observable facts, the police officers had noticed unusual or

10

suspicious conduct on [the suspect's] part"); *see also Johnson v. Campbell*, 332 F.3d 199, 207 (3d Cir. 2003) ("The Supreme Court has upheld a number of stops based on an officer's observation of entirely legal acts, where the acts, when viewed through the lens of a police officer's experience and combined with other circumstances, led to an articulable belief that a crime was about to be committed.").

We mentioned early on that this was a close call. This case pits the need for swift police action to enforce the law against the right of citizens not to be subjected to "unreasonable" police searches and seizures. Under these facts, we believe the seizure was not unreasonable. Indeed, Officers Feliciano and White had little choice but to stop the suspects. They were following up on a 911 call from an identified caller describing potentially dangerous and violent behavior. When they arrived at the scene, they saw the three men—one that matched the description in the tip—try to get into a car across the street from the home and leave. "[W]e are not going to second-guess the officers' decision to pursue the suspect[s] immediately" rather than let them leave the scene. *Valentine*, 232 F.3d 350, 355 (3d. Cir. 2000) (stating that if the officers had "stalled for more lengthy questioning of the informant, the armed suspect could have escaped detection").

### D. The Frisk

We turn to the legality of the frisk. Officer Feliciano noticed a bulge protruding from Carstarphen when he got out of the car. It was consistent with the shape of a gun in light of Officer Feliciano's experience and training. He therefore had reasonable

11

suspicion to frisk Carstarphen for weapons. *See United States v. Edwards*, 53 F.3d 616, 619–20 (3d Cir. 1995) (stating that police officers may take such steps as are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop" (citation and internal quotations omitted)).

## IV.    Conclusion

Daniels's tip and the corroborating circumstances prior to the stop and frisk were sufficient to give rise to reasonable suspicion. Accordingly, we reverse the District Court's order and remand the case for further proceedings.